\* PARKER v. BETHEL HOTEL CO.

(*Nashville.* February 22, 1896.)

1. CORPORATION. *Not dissolved by nonuser of franchises.*

The conveyance by a corporation of that part of its property which was necessary to carry on its business, and the fact that it never thereafter elected directors, or otherwise exercised its corporate powers, did not dissolve the corporation. (*Post, pp. 270–275.*)

Cases cited and approved: State v. Butler, 86 Tenn., 614; Bache v. Nashville Horticultural Society, 10 Lea, 436; Maryville College v. Bartlett, 8 Bax., 231; 3 Watts, 46; 24 Pick., 49; 5 Johns. Ch., 366; 2 Doug., 124; 4 Rawle, 9; 24 Vt., 228; 14 Pick., 63; Hopk. Ch., 354; 13 N. J. Eq., 322; 7 Johns. Ch., 217; 3 Edw. Ch., 123; 47 Md., 239.

2. SAME. *Ownership of all the capital stock by one person does not work dissolution.*

The fact that all the shares in a joint stock company or corporation have passed into the hands of a single person does not, *ipso facto*, work a dissolution of the corporation. (*Post, pp. 275–277.*)

Cases cited and approved: 14 Pick., 69; 42 Ga., 148; 26 Minn., 43.

3. SAME. *A stockholder owning all the shares has no title to its property.*

A stockholder of a solvent corporation, who becomes the owner of all the shares of stock of said corporation, does not thereby acquire any estate or title in the real estate of the corporation. It continues the property of the corporation. (*Post, pp. 277–280.*)

Cases cited and approved: Keith v. Clarke, 4 Lea., 718; Lillard v. Porter, 2 Head, 176; 15 Vt., 519; 140 U. S., 304; 26 Minn., 43.

4. SAME. *Property of corporation cannot be sold and conveyed by its individual stockholders.*

The property of a corporation is not subject to the control of its individual members, whether acting separately or jointly. They can neither incumber nor transfer it, nor authorize others to do so. The corporation holds the property, and alone can convey or transfer it; and the corporation acts only through its officers, subject to the provisions prescribed by law. The

\* Syllabus prepared by Judge Bradford.—REPORTER.

Parker *v.* Bethel Hotel Co.

conveyance, therefore, of the property of a corporation by one who is sole stockholder therein, by deed executed in his own name, is void. (*Post, pp. 280, 281.*)

5. SAME. *Real estate of corporation, how conveyed.*

Real estate of a corporation can be conveyed only by deed executed in its name by a duly authorized officer or agent, and under seal, if it have a seal. (*Post, p. 281.*)

Case cited and approved: Garrett *v.* Belmont Land Co., 94 Tenn., 460.

6. SAME. *Transfer of stock passes title to transferee.*

The transfer and assignment of certificates of stock in a corporation, either by absolute sale or by way of pledge, passes to the vendee or transferee the title thereto. (*Post, pp. 281–284.*)

Cases cited and approved: Comick *v.* Richards, 3 Lea, 25; Cherry *v.* Frost, 7 Lea, 1; Caulkins *v.* Gas Light Co., 85 Tenn., 683; West Nashville Planing Mill Co. *v.* Nashville Savings Bank, 86 Tenn., 252.

7. SAME. *Rule requiring transfer on books of company, effect of.*

The rule requiring transfer of stock on the books of the company, is a rule made solely for the benefit of the company. The title of the transferee is perfect, as between himself and the transferer, and the transferee is entitled, upon presentation to the corporation of his certificate, to have himself registered on its books as the real owner. (*Post, pp. 284, 285.*)

Case cited and approved: Smith *v.* Railroad, 91 Tenn., 221.

8. SAME. *Transfer of stock need not be in writing.*

A sale or transfer of stock, to be valid, need not be in writing. A transfer is good, although the seller of the stock never had a certificate at all, and although no certificate is issued to the transferee. (*Post, p. 283.*)

9. LACHES. *Mere delay not a bar generally.*

A Court of Equity will not enforce stale demands where the party seeking its aid has slept on his rights and acquiesced for an unreasonably long time. Laches is always discountenanced. But delay alone, unaccompanied by other circumstances, will not necessarily preclude relief. Where the situation of the parties has not been altered, and one has not been put in a worse condition by the delay of the other, the defense of laches does not generally apply. (*Post, pp. 285–288.*)

Parker v. Bethel Hotel Co.

Cases cited and approved: 3 Bro. Ch., 640; 28 Ohio St., 568; 13 Gratt., 354; L. R., 9 Eq., 44.

10. USURY. *Who can plead.*

The right to plead usury is a privilege personal to the debtor. The exception to the rule embraces the debtor's sureties, guarantors, heirs, devisees, and personal representatives. (*Post, pp. 288–292.*)

Cases cited and approved: Nance v. Gregory, 6 Lea, 343; McKinney v. Hotel Company, 12 Heis., 104; 39 Mo., 445; 44 N. H., 227; 32 Conn., 550; 13 Ind., 568; 26 Ohio St., 59; 49 N. Y., 635; 44 Minn., 208.

11. SAME.

Relief against usury will not be granted in equity after a judgment at law on the debt. (*Post, p. 292.*)

Cases cited and approved: Frierson v. Moody, 3 Hum., 561; Goff v. Dabbs, 4 Bax., 300.

12. CORPORATION. *Cannot be dissolved in winding up proceedings.*

A corporation cannot be dissolved in equitable proceedings brought by its creditors and its stockholders for its winding up. That could be done only by suit brought for that purpose by the State. (*Post, p. 292.*)

\*13. SAME. *Service of process on officers holding over, sufficient.*

Service of process in a proceeding to wind up a corporation which had ceased to transact business, upon the last elected officers of the company, who, by the terms of the charter, held over until the election of their successors, was sufficient to bring the corporation before the Court. (*Post, pp. 292, 293.*)

FROM MAURY.

Appeal from Chancery Court of Maury County. A. J. ABERNATHY, Ch.

---

*Who may be served with process in a suit against a foreign corporation is a question considered in an extensive note to *Foster* v. *Chas. Betcher Lumber Co.* (S. D.), 23 L. R. A., 490, while the subject of sole ownership of the stock of a corporation is considered in a note to *Louisville Banking Co.* v. *Eisenman Bros. Co.* (Ky.), 14 L. R. A., 684.—REPORTER.

Parker *v.* Bethel Hotel Co.

G. T. HUGHES, FUSSELL & WILKES, W. S. FLEMING, JR., GRANBERY & MARKS, and JOHN T. WILLIAMSON for Parker.

FIGUERS & PADGETT, E. H. HATCHER, and W. J. WEBSTER for Hotel Co.

J. C. BRADFORD, Sp. J. On May 24, 1880, P. C. Bethel, W. D. Bethel, Lucius Frierson, Eugene Pillow, J. M. Mayes, and L. W. Black became incorporated, under the laws of the State of Tennessee, as the Bethel Hotel Company. The business of this corporation, as declared in its charter, was the erection, furnishing, and operation of a hotel in the town of Columbia, Tenn., the hotel building to include storehouses and a concert hall. The charter was taken out under Chapter 142 of the Acts of 1875, and is in the form prescribed for hotel companies, except that words were added authorizing it to build and own storehouses and a concert hall. The corporation was duly and regularly organized, with a capital stock of $100,000, divided into shares of $50 each. After its organization, the building contemplated by the charter was erected on a lot owned by the corporation. The building was so designed and constructed that the part used for hotel purposes was on the second floor, with an entrance on the first floor. The stores were on the first floor, under that part of the building used as a hotel, but the precise situation of the con-

cert hall, or, as it is called, the opera house, does not appear.

The corporation occupied and used the building, or leased it, or both, from the date of its completion until September 1, 1885. On that date the Bethel Hotel Company and Lucius Frierson, for the consideration of $22,500, payable in ten annual installments, evidenced by the notes of the purchasers, conveyed to Mayes & Dodson certain parts of the building, particularly described, which were designated as the hotel proper part of said building, including the part from the second floor up, and all appurtenances and privileges incident thereto.

The deed to Mayes & Dodson was signed ''Bethel Hotel Company, W. D. Bethel, President; Lucius Frierson, Secretary and Treasurer; and Lucius Frierson.''

The sale and conveyance to Mayes & Dodson were authorized by the stockholders of the corporation, at a meeting held shortly before, at which a majority, but not all, of the stockholders were present or represented. This meeting was the last ever held by the stockholders of the Bethel Hotel Company.

At the time the sale aforesaid was made to Mayes & Dodson, and at the date of the meeting of the stockholders which authorized it, the majority of the stock of the corporation was owned by Lucius Frierson and by W. D. Bethel, individually and as administrator of the estate of P. C.

Bethel, deceased. The holdings of Frierson amounted to thirty-four thousand dollars or thereabouts, and those of Bethel to sixty-one thousand dollars.

On the twenty-eighth day of August, 1886, Frierson purchased from Bethel all the stock held and owned by him, individually and as administrator. Some time either before or after the purchase of the stock from Bethel, it does not appear which, he acquired such of the stock as was not owned by him and Bethel, and thus became the owner of the entire capital stock of the corporation.

The consideration Frierson paid and agreed to pay Bethel for said $61,000 of stock, was the following: the transfer and assignment to Bethel of the Mayes & Dodson notes, payable to the Bethel Hotel Company, aggregating $22,500, notes of McEwen & Dale for $4,000, payable to Frierson, and his own notes, six in number, for $658.33 each. To secure the payment of Frierson's notes, the McEwen & Dale notes, and the indorsement of Frierson and the Bethel Hotel Company on the Mayes & Dodson notes, the stock was left in the possession of Bethel, to whom was reserved "all the power usual to such a pledge in the case of default in payment and satisfaction of said notes." The contract between Frierson and Bethel was in writing.

In September, 1885, immediately after the sale to Mayes & Dodson, and the stockholders' meeting authorizing it, Frierson took possession of the residue of the property of the corporation, and used and

17—12 P

treated it as his own. He leased it, collected the rents, used them for his own purposes, and accounted to no one. He used and controlled the property in this manner, without protest or interference from any-one, until January, 1892, when it was conveyed in trust to defendant, W. J. Webster, as will hereafter appear.

During this long period of seven years, the corporation slept, or was dead, as will be hereafter determined. No meetings of the stockholders and directors were held, no officers were elected, and no business seems to have been transacted by the corporation. The explanation of this anomalous condition of affairs will be found in the claim made by Lucius Frierson, that the corporation had ceased to exist after he acquired all its stock, and that he became and was the real owner of its property. He says, and claims, that it was understood by the stockholders, at the meeting which authorized the sale to Mayes & Dodson, that the corporation would go into liquidation, and that he, as the owner of all its stock, would become the owner of all its property, and that a resolution to that effect was adopted.

Frierson appears to have been an active trading man. His business required the use of considerable money, and he was compelled to borrow largely from others. Both before and after the date of the alleged resolution of the board of directors, putting the corporation into liquidation, he made a large number of loans from divers persons. To secure these loans he

used as collateral his stock in the Bethel Hotel Company. On May 3, 1882, he borrowed from J. M. Mayes, trustee for Mrs. Annie Jackson and her children, $4,000, executing his note therefor, and depositing, as collateral, to secure the same, one hundred shares of Bethel Hotel Company stock. The note was subsequently renewed, and forty shares more of the stock were added as collateral. This note, with the collateral (140 shares) attached, came into the hands of G. T. Hughes, who succeeded Mayes as trustee. The Second National Bank loaned Frierson $5,000 on the second day of August, 1882, taking his note for that amount, with $6,000 of the stock of the Bethel Hotel Company attached as collateral. This loan was renewed nine different times. At the date of the last renewal, December 31, 1887, it was increased to $6,000. The increased loan was renewed from time to time, until it was taken up on December 28, 1891, by A. N. Aiken and W. M. Mayes, who, at Frierson's request, and for his accommodation, executed four notes, three of which were for $2,000 each, and one for $325 (the latter being for interest and discount), payable to Frierson's order, which notes were delivered to the bank. The hotel company stock securing the original loan was retained as collateral on the new notes executed by Aiken and Mayes. It may as well be stated here, that these notes were renewed from time to time, and, finally, on February 10, 1893, some payments having been made by Aiken, Mayes and Aiken exe-

cuted their three notes, two of them being for $2,000 each and one for $1,700. J. Milton Parker made Frierson a loan in October, 1883, and took as security one hundred shares of the hotel company stock. Payments were made by Frierson, and the loan was reduced to $1,994.61, and a note was executed for that amount on November 22, 1891, with the stock attached. Mrs. S. B. Francis loaned Frierson $4,000, on November 1, 1883. This loan was secured by collateral of some kind, but what it was is not shown. In October, 1884, Frierson substituted for the original security, one hundred shares of Bethel Hotel Company stock. There were several payments on and renewals of this loan. The last note in renewal, executed by Frierson, was for $2,737, dated April 21, 1891. The hotel stock, one hundred shares, was attached as security. On the fourteenth day of April, 1892, Mrs. Francis recovered a judgment on said note in the Chancery Court of Maury County, for $2,901.22, and an order for the sale of the stock. The order of sale was not executed. J. W. Frierson, Jr., is the administrator of the estate of Mrs. E. K. Mayes. He discovered, after qualifying, a note of Lucius Frierson for $1,750, dated April 6, 1886, payable to Mrs. Mayes, with forty shares of Bethel Hotel Company stock attached as collateral. A new note was executed and delivered by Lucius Frierson to the administrator, April 6, 1892, for $1,890, with the same security. W. B. Wilson holds a note of Frierson for $1,700,

dated April —, 1891, for money loaned. He holds, as security, thirty shares of the hotel company stock. This note is in renewal of one made in 1888. On February 10, 1891, Walter Steele loaned Frierson $2,500, taking his note therefor. To secure this note Frierson pledged fifty shares of the hotel company stock. On July 1, 1891, Frierson reduced the note, by payment, to $1,500.

On January 12, 1892, Lucius Frierson conveyed, by deed, to defendant, W. J. Webster, the real estate owned by the Bethel Hotel Company, and the stock of that company purchased by him from W. D. Bethel. The purpose of said deed was to secure the payment of certain debts owing by said Frierson to sundry parties, aggregating about $45,000. One of his creditors, W. C. Wooten, was preferred to the amount of $5,000, but the other creditors were to be paid *pro rata*. The deed directed Webster to take immediate possession of the property, collect the rents, sell it, and apply the proceeds to the payment of the debts named, in the order stated. Webster accepted the trust, and took possession of the property conveyed.

None of the creditors of Frierson who had loaned him money on the stock of the Bethel Hotel Company, were provided for in the deed of trust, except Aiken and Wilson, and they only in part. On the twenty-seventh day of August, 1892, J. Milton Parker, and the others of said creditors, filed the original bill in this cause against the Bethel Hotel Com-

pany, Lucius Frierson, W. J. Webster, trustee, and the creditors provided for in the deed of trust, except Aiken and Wilson.

The purpose of the bill was to annul the trust deed to Webster, have the corporation dissolved and wound up, its property sold, and the proceeds distributed among the holders of its stock as they were entitled. The bill charged that Lucius Frierson had no other interest in the property of the corporation, than as stockholder; that the legal title thereto was vested in the corporation, and had not been divested by the conveyance to defendant, Webster. They state that they are not disposed to disturb the sale and conveyance to Mayes & Dodson, but insist that the proceeds of that sale shall be equally distributed among the holders of the stock in the corporation, or that the $61,000 of stock sold by W. D. Bethel to Frierson, and retained by him as security, shall, upon an adjustment of the equities among the stockholders, and the final winding up of the affairs of the corporation, stand charged with the amount thereof. It is further insisted that, since Lucius Frierson had purchased all the stock· in the corporation, and become the sole owner thereof, and there had been no meeting of stockholders, and the directors had parted with their stock and ceased to act, the corporation ought to be dissolved, its affairs wound up, its property sold, and the proceeds distributed. Complainants also charged that, by virtue of the transfer to them by Lucius Frierson of the stock severally held

by them as security, title thereto was vested in them, and that they are entitled to receive all sums and dividends that may be paid or become due on account of said stock, as fully as though they were the absolute owners thereof, to the end that the several debts owing to them by said Frierson, and for the security of which said stock was hypothecated, should be paid. Complainants state that they make no objection to the transfer of the $61,000 of stock by Bethel to Frierson, but insist that the conveyance thereof, by the latter to Webster, shall not be so construed as to vest any interest in the real estate of the corporation in Webster, further than as a stockholder in said corporation.

Defendant, Webster, as trustee, and on behalf of the beneficiaries named in the trust deed, answered the bill. He says the Bethel Hotel Company erected the building known as the Bethel Hotel, and owned and operated it until September 1, 1885, when part of it was sold to Mayes & Dodson; that Lucius Frierson owned, at that time, all the stock in the company except the shares of the Bethels, which he then purchased; that at that time the corporation went into liquidation, and ceased to transact any corporate business; that upon becoming sole owner of all the capital stock, he became the equitable owner of the company's property and assets, took charge of it as his own, gave it in for taxes in his own name, and continued to hold it as his own adversely to all the world, until he conveyed it to defendant, Webster.

It is insisted that all transfers, assignments, and pledges of stock made by Frierson, after September 1, 1885, the date of the sale to Mayes & Dodson, and of the "liquidation" of the corporation, were void. As to the transfers and assignments of stock made before that date, it is not claimed that they were illegal, but it is averred that the assigns and holders thereof are estopped to assert any right in the corporate property conveyed to Webster, and are barred of any recovery or relief, because of long delay and laches in asserting or claiming their rights. The statutes of limitation of six and seven years are pleaded and relied on.

Lucius Frierson also answered the bill. His answer is substantially the same as that of his co-defendant, Webster. He says that in September, 1885, he became the owner of the stock of the Bethel Hotel Company, and that it was intended and agreed, when part of the property was sold to Mayes & Dodson, that the company should go into liquidation, and that he should be the owner of the residue not sold, and that thereafter he gave it in for taxes in his own name. He admits that he pledged some of his stock after that date, but says he thought the shares so pledged represented shares or interests in the property of the corporation.

W. D. Bethel also filed an answer. The substance of it is, that there was a balance of $1,640 due him from Frierson, on the purchase of the

$61,000 of stock, and that he holds it as security for said balance.

Pending the cause, and before final decree, the following stipulation was entered of record, viz.: "In this cause it is agreed that the case shall be tried as if Wm. J. Webster, trustee, and the creditors represented in the deed of trust from Lucius Frierson to Wm. J. Webster, had filed a cross-bill as of this date against the Second National Bank, J. Milton Parker, and S. W. Warfield, individually and and as administrator of Mrs. Francis, and all other complainants, setting out and claiming credit and to recover usury, as pointed out and indicated in the depositions of S. W. Warfield, Geo. Childress, J. M. Parker, and other complainants, and that it shall be taken as if answered, and all the equities denied, and a plea of the statute of limitations and all other defenses made, but shall be determined on the proof and facts as developed in the record, without the necessity of filing a cross-bill and answer thereto, this course being taken to facilitate the trial of the cause at this term on its merits."

During the progress of the cause, Mrs. S. B. Francis, one of the complainants, died, and the cause was revived in the name of S. W. Warfield, her administrator; and, the Second National Bank having suspended and gone into liquidation, the original bill was amended so as to make its receiver, John T. Williamson, a party complainant. Several other

amendments were made not necessary to be mentioned.

The Chancellor decreed that the Bethel Hotel Company was not dissolved by the sale of the property to Mayes & Dodson, or the purchase of the stock of W. D. Bethel by Lucius Frierson, or the passage of the resolution by the stockholders authorizing a sale of the property to Mayes & Dodson; but that the property of the corporation, other than that conveyed to Mayes & Dodson, remained the property of said hotel company, charged with a trust for the payment of its debts and for distribution among its stockholders; that Lucius Frierson and his assignee, W. J. Webster, were estopped to deny the validity of the certificates of stock held by complainants, which had been transferred to them by Frierson, and that the holders of said stock were entitled to share in the assets of said corporation, and were not barred by any statute of limitations, or by any laches on their part. It was further decreed by the Chancellor, that in the distribution of the proceeds of sale of the property of the corporation, the stock that had formerly belonged to W. D. and P. C. Bethel, and which had been transferred to Lucius Frierson by W. D. Bethel, personally and as administrator, should be charged with the sum of $22,500, the amount of the Mayes & Dodson notes which were assigned by him to said Bethel. Frierson was relieved of liability for rents received during the time he had possession of the

property.    Touching the balance of the debt due W. D. Bethel, as administrator and personally, by Frierson, on the purchase of the stock from him, it was ordered that the amount should be paid, first, out of the *pro rata* going to said stock in the distribution.    This provision of the decree was assented to by all parties.

The Chancellor was of the opinion that the Bethel Hotel Company ought to be "wound up and dissolved," and he accordingly so decreed; he also directed that its property be sold, and the proceeds distributed.    The Bethel Hotel Company owed no debts, and the proceeds of the sale of its property was, accordingly, ordered to be distributed among the holders of its stock.

We will not now stop to state the rulings of the Chancellor on the questions of usury.    They will be adverted to later on.

Special appeals from the Chancellor's decree were prayed by W. J. Webster, trustee, and the beneficiaries named in the deed of trust by the Second National Bank and its receiver, John T. Williamson, and by S. W. Warfield, administrator of Mrs. S. B. Francis, deceased.    The nature and extent of the several appeals can best be stated in the words of the decree, as follows: "From so much of said decree as adjudicates that the Bethel Hotel Company was not dissolved in 1885, and that all stock placed as collateral since 1885 were valid claims against the corporation, and all stock before 1885 were not

barred by laches of the creditors holding the same
as collateral, and so much of the decree as adjudi-
cates that the Bethel stock should be charged with
$22,500 of the sale to Mayes & Dodson, and so
much as adjudicates that W. J. Webster, trustee,
and those claiming under him, are not entitled to
all of said property, the said W. J. Webster,
trustee, and the creditors named in the deed of
trust, except, and pray an appeal to the next term
of the Supreme Court, but not in anywise to
affect the decree in their favor. To so much of
said decree as charges the Second National Bank
and John T. Williamson with usury, and reduces
the debt of said bank by payments of interest
made on said loans and not allowing interest on
said debt, said Second National Bank and John T.
Williamson, receiver, pray an appeal to the next
term of the Supreme Court; and to so much of
said decree as charges the defendant, S. W. War-
field, administrator, with all interest paid in excess
of six per cent. upon his debts, and directs the
same to be credited upon said debt, as of the date
of their payment, the said S. W. Warfield, admin-
istrator, excepts, and prays an appeal to the next
term of the Supreme Court.''

The case was heard by the Court of Chancery Ap-
peals. That learned Court, in an elaborate and ex-
tremely able opinion, affirmed . the decree of the
Chancellor in all respects, except his rulings on the
question of usury and that part of it which directs

that the Bethel Hotel Company be dissolved, which were overruled.

It is not claimed that the legal title to the real estate conveyed in the trust deed was in Lucius Frierson at the date of that instrument, or ever was in him. The Bethel Hotel Company, it will be remembered, conveyed all that part of the building adapted to hotel purposes to Mayes & Dodson, leaving several stores and the opera house. It never made any conveyance of the residue of said property, or any part thereof.

It is claimed that the corporation conveyed one of the stores to the wife of Lucius Frierson. It seems that on August 29, 1886, "W. D. Bethel, President, and Lucius Frierson" made and executed a deed to one of the stores and the lot on which it was situated, to Mrs. Kate Frierson, the wife of Lucius. According to the testimony of Lucius Frierson, this deed was authorized by the stockholders at the same meeting at which the resolution authorizing the sale of the hotel part of the building to Mayes & Dodson, and directing the liquidation of the corporation, was adopted. But the Court of Chancery Appeals has found as a fact, that the deed was executed without the knowledge of Mrs. Frierson, and was never delivered to her. It may be regarded as settled, therefore, that the legal title to the property conveyed to defendant, Webster, was, at the date of that instrument, in the Bethel Hotel Company, where it had been, unquestioned and undis-

turbed, since 1880, the year of its incorporation and organization.

Defendants insist that, although Frierson may not have been invested with the legal title, he, nevertheless, had such an equitable estate and interest as entitled him to sell and dispose of the property. In other words, that he was the real owner of the property, and, as such, had the absolute right to use or dispose of it. This alleged equitable estate was not the creation of any deed or written contract, executed by the Bethel Hotel Company, or of any corporate act or resolution adopted by the stockholders or directors, which in terms referred to or defined it, but is rather the result and consequence of certain facts and conditions, the existence of which is affirmed by the defendants.

It is said that the Bethel Hotel Company, by the alienation of that part of its property built for and adapted to the uses and purposes of a hotel, deprived itself of the means of conducting a hotel business, and that, since 1885, the date of the sale to Mayes & Dodson, it had ceased to exercise its corporate franchises; that the stockholders, at the meeting held in September, 1885, passed a resolution, or agreed among themselves, that the corporation should go into liquidation, and that Lucius Frierson, being then the owner of all the capital stock of the corporation, became, in consequence, the equitable owner of all its property, with full power to use it or dispose of it in such manner as he might choose

to do.   The position of the defendants seems to be, that all rights of the corporation in the property were extinguished, that it had ceased to be affected with any corporate uses, and that it belonged absolutely to Frierson.

The facts affirmed by defendants are not all of them exactly as found by the Court of Chancery Appeals.   It is true that the corporation sold and conveyed the hotel part of its building to Mayes & Dodson, retaining only the stores and opera house, and never afterwards engaged in the business of owning and operating a hotel.   Lucius Frierson was not the sole stockholder in 1885, when the hotel was sold, and did not become such until August 28, 1886, when he purchased the Bethel stock.   His stock, or a large part of it, at that time and subsequently, was held as collateral security by other parties.   It is not true that a resolution was ever adopted by the stockholders directing the liquidation or winding up of the affairs of the corporation, or that they were ever wound up.   The facts, as found by the Court of Chancery Appeals on this point, are stated in its opinion in the following words: "It may be fairly inferred, though it does not distinctly appear in terms in the proof, that when the deed was made to Mayes & Dodson it was then understood between W. D. Bethel and Lucius Frierson, they then owning practically all, or nearly all, of the stock, that Bethel should take the proceeds of the sale to Mayes & Dodson, amounting to $22,-

500, and a sufficient amount, in addition, from Lucius Frierson, personally, to make $30,000, and for this he would transfer his stock, $61,000, to Frierson, and that this arrangement was consummated, so far as it could be done without direct corporate action of the corporation itself, by the paper of August 28, 1886, made by Bethel to Frierson, and this is what they understood by the resolution to go into liquidation, there being no debts due by the corporation, and, following out this idea, from the date of the sale to Mayes & Dodson, Lucius Frierson proceeded to treat the property as his own, on the idea that he himself constituted the corporation. We do not think that he entertained the idea that the corporation was defunct, but simply that he was, himself, the corporation, and could do what he wished with the assets.''

In considering the position of the defendants, that Frierson became the equitable owner of the assets of the corporation, we must, therefore, leave out of view the idea that there was any corporate action looking to a dissolution of the corporation and winding up of its affairs. Frierson's estate or interest in the property, if he had any, rests on the postulate that, in consequence of the nonuser of its franchises and his sole proprietorship of all its capital stock, the corporation was dissolved, and he became the equitable owner of all its property.

A corporation can be dissolved, and its existence wholly terminated, only by the extinguishment of the

corporate franchises conferred by the State. An ordinary business corporation, where its charter specifies no definite time for its continuance, may sell its property and wind up its affairs whenever a majority of the stockholders may deem it advisable (*Treadwell* v. *Saulsbury Mfg. Co.*, 7 Gray, 393; *Black* v. *Delaware & C. Canal Co.*, 22 N. J. Eq., 416); but the franchises conferred upon the stockholders by the State are not extinguished by the cessation from business thus brought about.   2 Morawetz on Corp., § 1004. In the case of *State* v. *Butler*, 86 Tenn., 614, 628, this Court said the mere insolvency of a corporation would not work a dissolution, nor would the assignment of all its property, or the appointment of a receiver, extinguish the franchises with which the company had been invested, where there had been no proceedings for forfeiture inaugurated by the State, or surrender by act of the stockholders.   And so, also, the omission to elect directors or other corporate officers does not, of itself, work a dissolution of a corporation.   The board of directors or other managers or officers do not form an integral part of a joint stock corporation, and, therefore, the omission to elect them operates to suspend the powers of the corporation for the time being, since it cannot act without them, but a subsequent election will restore its functions. *Rose* v. *Turnpike Co.*, 3 Watts (Pa.), 46; *Boston Glass Manuf.* v. *Langdon*, 24 Pick. (Mass.), 49 (35 Am. Dec., 292, 295).   And where the charter of a corporation, as in the present case, expressly

18—12 P

provides that, in case of the failure to elect directors, at the prescribed time, the old directors shall continue in office until their successors are elected, it is unavoidably true that the corporation will not be dissolved. *Slee* v. *Bloom*, 5 Johns. Ch., 366; *Cahill* v. *Kalamazoo Mut. Ins. Co.*, 2 Doug. (Mich.), 124 (43 Am. Dec., 464); *Lehigh Bridge Co.* v. *Lehigh Coal & Nav. Co.*, 4 Rawle, 9 (26 Am. Dec., 112).

Nor is a corporation, *ipso facto*, dissolved by merely neglecting to exercise its corporate powers, so long as the possibility remains of resuming them. *Brandon* v. *Gleason*, 24 Vt., 228; *Russell* v. *McLellan*, 14 Pick. (Mass.), 63; *Attorney-general* v. *Bank of Niagara*, Hopk. Ch. (N. Y.), 354. And the sale or disposal by a corporation of its real property, though it have the effect of substantially destroying the object for which it was created, does not, of itself, work its dissolution. *Zinc Co.* v. *Franklinite Co.*, 13 N. J. Eq., 322, 335; *Brinkerhoof* v. *Brown*, 7 Johns. Ch., 217; *Barclay* v. *Talman*, 4 Edw. Ch., 123. Thus, it has been held that suspending active operations, resolving to go into liquidation, depositing with the United States Treasurer money to redeem its outstanding circulation, and receiving a re-assignment of its bonds, are acts insufficient to operate as a final dissolution of a national bank. *Ordway* v. *Central National Bank*, 47 Md., 239. In *Bache* v. *Nashville Horticultural Society*, 10 Lea, 436, 443, it was said, "the nonuser of its franchises by a corporation

will not alone work a dissolution, or affect the title or right to its property.'' And in *Maryville College* v. *Bartlett*, 8 Bax., 231, it was held that the non-user by the trustees of a corporation of its franchises and property, did not affect the title of the corporation.

Admitting it to be true, as claimed, that Frierson was the owner of all the stock of the corporation, it by no means follows that the corporation was thereby dissolved and forfeited its franchises. On this question the latest text writer on corporation law has this to say: ''Contrary to early opinion, it is now generally held that the fact that all the shares in a joint stock company have passed into the hands of two members, or even into the hands of a single person, does not, *ipso facto*, work a dissolution of the corporation, since such sole owner may so dispose of the shares, as, by the election of the necessary directors and officers, to continue the corporate existence.'' 5 Thompson's Commentaries on the Law of Corporations, Sec. 6653. And, in 2 Morawetz on Corporations, Sec. 1009, it is said: ''It is well settled that all the shares of a corporation may be held by a single person, and yet the corporation continue to exist, and, if the charter or by-laws should require certain acts to be done by more than one shareholder, the sole owner may transfer a portion of his shares to other persons, so as to conform to the letter of the rule.'' It has been held that a corporation which has sold all

its assets, with the intention of putting an end to its business, whose officers had all resigned, and whose stockholders had all transferred their shares to a single person, was, nevertheless, not dissolved, and that its existence could be terminated only by judgment of forfeiture or by surrender accepted by the State. *Russell* v. *McLellan,* 14 Pick. (Mass.), 69, 70; *Newton Mfg. Co.* v. *White,* 42 Ga., 148; *Baldwin* v. *Canfield,* 26 Minn., 43.

The dissolution of a business corporation is effected in one of the following ways: (1) by the expiration of its charter; (2) by Act of the Legislature, where power is reserved for that purpose, or there is no constitutional inhibition; (3) by surrender of charter which is accepted; (4) by forfeiture of the franchises and judgment of dissolution, pronounced by a Court having jurisdiction. 2 Morawetz, Sec. 1004; Taylor on Private Corporations, Sec. 430. It is not pretended that the Bethel Hotel Company was dissolved in either of the ways indicated. The charter of the corporation has not expired, neither has it been repealed by the Legislature, or been surrendered to the State by its members or stockholders. It may be true that there was a nonuser of its franchises by the corporation for a period of seven years or more, occasioned by the sale of the only property it owned which could have been used for hotel purposes. Undoubtedly, the nonuser of its franchises by a corporation is ground for dissolution and forfeiture of its charter, at the instance of the State;

but until sentence of dissolution has been pronounced by a Court of competent jurisdiction, in a proper proceeding instituted for the purpose, the corporation will continue to exist, notwithstanding its failure to use its franchises. And forfeiture can only be decreed in a proceeding directly instituted for the purpose, by the State granting it. Code (M. & V.) § 1712; *State* v. *Butler*, 15 Lea, 104, 110; *Jersey City Gaslight Co.* v. *Consumers' Gas Co.*, 40 N. J. Eq., 427; *Broadwell* v. *Merritt*, 87 Mo., 95. Until dissolution has been thus judicially pronounced, neither the existence of the corporation or its title to its property can be questioned collaterally.

We are bound to conclude, therefore, that the Bethel Hotel Company was not dissolved, or its franchises extinguished, for any of the reasons alleged by the defendants, and that it is now a corporation endued with life, with authority to own property and exercise all the powers conferred on it by its charter.

Defendants insist that the alleged equitable estate of Lucius Frierson in the property of the Bethel Hotel Company, did not depend alone upon the dissolution of the corporation, but resulted also from the fact that he was the sole owner of all its capital stock. The proposition is, that if one person owns all the shares of stock of a corporation which owes no debts, he, in virtue of such ownership, becomes the equitable owner of all its property, or, at least, may sell and dispose of it by deed, if he choose to do so. This proposition is argued by

counsel for defendant with force and ability, and is supported by some authority. It has found favor with the Supreme Court of Maryland (*Swift* v. *Smith*, 65 Md., 428, 433); but the decision of that learned Court is opposed by the current of authority, and seems to us to overlook and ignore certain principles that are fundamental.

A corporation and its shareholders are distinct legal entities. In *Keith* v. *Clark*, 4 Lea, 718, this Court held that, notwithstanding the State owned all the stock in the Bank of Tennessee, "the bank and the State are entirely different legal entities;" and in *Lillard* v. *Porter*, 2 Head, 176, it was said, "stockholders are totally distinct from the corporation." Important consequences result from this rule. The shareholders are neither responsible for the debts nor for the torts of the corporation. In the absence of special circumstances, the shareholders cannot be parties, either plaintiffs or defendants, in actions respecting corporate rights, nor have they any title or direct interest in the property of the corporation.

"Shareholders," says Thompson, "are not joint tenants or in any other sense co-owners of the corporate property, either before or after its dissolution. The title to it rests exclusively in the legal entity called the corporation. A share of the capital stock merely gives the right to partake, according to the amount put into the fund, of the surplus profits of the corporation, and ultimately, on the

dissolution of it, of so much of the fund thus created as remains unimpaired and is not liable for debts of the corporation.'' Commentaries on the Law of Corporations, Sec. 1071. As the shareholders have no direct interest in the corporate property, they cannot convey the real estate of the corporation, though all join in the deed.

In *Wheelock* v. *Moulton*, 15 Vt., 519, Redfield, J., stated the reasons for the rule in his usual clear and accurate style. In that case, Moulton and Hutchinson, sole proprietors and owners of all the stock of a corporation, conveyed its real estate, in mortgage, to secure the repayment of money borrowed of the plaintiff, Wheelock. He brought suit to enforce his mortgage. Judge Redfield said: ''The fact that the signers of this deed owned the whole of the shares will make no difference in regard to the necessity of a vote of the corporation, in order to convey the land. The title to the land was in the corporation, not in the individual shareholders. The deed of one, or of any number of the stockholders, will not affect the title to the land. The share owners are not tenants in common of the land. They have no title whatever to any of the property of the corporation. It is true that one who owned all the shares might control the corporation, and so he could if he owned a majority of the shares; but he could, in either case, do it only by a vote of the corporation, at a meeting held in strict accordance with the statutes of the corporation.''

And in *Humphreys* v. *McKissick*, 140 U. S., 304, Mr. Justice Field, discussing the same question, said: "The property of a corporation is not subject to the control of individual members, whether acting separately or jointly. They can neither incumber nor transfer that property, nor authorize others to do so. The corporation—the artificial being created—holds the property, and alone can mortgage or transfer it, and the corporation acts only through its officers, subject to the conditions prescribed by law."

A very instructive case on this question is *Baldwin* v. *Canfield*, 26 Minn., 43. The facts of that case were very similar to those of this case, and the direct question now under consideration was passed upon. The opinion of the Court was in accord with the cases above cited. See also *Button* v. *Hoffman*, 61 Wis., 20.

We are thus led, both by reason and authority, to the conclusion that Lucius Frierson, as sole stockholder of the Bethel Hotel Company, had no title, legal or equitable, to its property. The title to the property was in the Bethel Hotel Company, and could only be conveyed by it. The conveyance of its real estate is one of the most solemn acts of a corporation, and it can only be done in pursuance of a vote of the corporation, and by deed executed in the form and mode prescribed by law. Thompson's Commentaries on the Law of Corporations, Sec. 5096. At common law a corporation could not execute a deed to realty except under seal; and the general corpora-

tions Act of 1875, under which the Bethel Hotel Company was organized, provides that, if the corporation have no seal, it shall be bound by the signature of its name by a duly authorized officer.

To have made a valid conveyance of the real estate of the company, it was necessary, therefore, that the deed should have been executed in the name of the corporation, under seal, if it had one, and, if not, its name should have been signed by an agent duly authorized by its governing agency, its board of directors. *Garrett* v. *Belmont Land Co.*, 94 Tenn., 460. As we have seen, nothing of this kind was done. The deed to defendant, Webster, was executed by Lucius Frierson, in his own name, and under his own signature. The Bethel Hotel Company, although it owned the property, was in no sense a party to it. For this and other reasons given, the deed of Lucius Frierson, conveying the real estate of the Bethel Hotel Company to defendant, W. J. Webster, was void, and conveyed to him no title or interest therein.

We have assumed as a fact, in the preceding discussion, that Lucius Frierson was, in truth, the sole owner of all the shares of stock of the Bethel Hotel Company at the date he executed the deed to Webster. But was he?

It will be remembered that Frierson assigned most of his stock in the Bethel Hotel Company to complainants, as security for money borrowed of them by him. Some of the loans were made before

September 1, 1885, the date of the conveyance to Mayes & Dodson, and the time, it is claimed by him, that the resolution directing the liquidation and winding up of the corporation was passed, and some of them were made subsequently. All of the loans and transfers of stock were made prior to the date of Frierson's deed to Webster. The stock owned by W. D. Bethel, personally and as administrator, was never transferred to him in fact. It was retained by W. D. Bethel, as security for the payment of the purchase money agreed to be paid therefor by Frierson in the contract of August 28, 1886, between them. The certificates of stock had attached to them blank transfers and powers of attorney in the usual form. All of the certificates were not issued in the name of Lucius Frierson. He purchased from different persons, and when they assigned their shares to him, they signed the transfers and powers of attorney. Frierson seems not to have surrendered the certificates and taken from the corporation others in his own name, but, when he pledged them as collateral, simply transferred them by delivery.

For the purposes of defense, defendants have separated the complainants into two classes, viz., those who acquired stock before September, 1885, the date of the alleged dissolution of the corporation, and those who acquired stock after that date. As to the latter, it is argued that, the corporation being dissolved, transfers of stock to them were ineffi-

cacious and conveyed no interest.    But this argu-
ment is built upon a false predicate.    There was
no dissolution of the corporation; the argument,
therefore, falls to the ground.    As to those of com-
plainants who obtained certificates of stock before
September, 1885, it is said they took them with
notice of a by-law of the company that no trans-
fer of stock would be good unless made on the
books of the company, and, the by-law not hav-
ing been complied with, the transfers were void.
It is not claimed by complainants that transfers
of the stock to them were made on the books of
the company.    Indeed, two of the complainants, Steele
and Wilson, hold their certificates by simple deliv-
ery, Frierson, in whose name the certificates were
made out, not having signed the transfer and power
of attorney on the back.    Although it is claimed
that there was a by-law of the company requiring
transfers on the books, it is probably no more than
a presumption from the words on the certificates.
But it may be assumed that there was such a by-
law.    A sale or transfer of stock, to be valid, need
not be in writing.    The certificate need not, in fact,
be delivered.    A transfer is perfectly good, although
the seller of the stock never had a certificate at
all, and although no certificate is issued to the trans-
feree.    An indorsement on the certificate, while not
necessary, is the preferable and most convenient form
of transfer, because the same instrument then com-
bines the evidence of the seller's right to the stock

and of his transfer to the purchaser. Lowell's Transfer of Stock, Secs. 43, 44.

There is no longer any doubt that the transfer and assignment of certificates of stock in a corporation, either by absolute sale or by way of pledge or security for debt, passes to the vendee or pledgee the title thereto. *Cornick* v. *Richards*, 3 Lea, 25; *Cherry* v. *Frost*, 7 Lea, 1; *Bank* v. *Planing Mill*, 86 Tenn., 252; *Caulkins* v. *Gas Company*, 85 Tenn., 683. Provision in the by-laws of the corporation requiring the transfer to be made on the books of the company, is solely for the benefit of the corporation. When shares of stock are transferred, there is a complete substitution of one person for another in all the rights and duties attaching to the interest forming the subject of their contract. An entry on the books is not necessary to vest the vendee with all the title which the vendor had. By the sale and assignment, the vendor divests himself of not only the equitable, but the legal title, and this principle applies, notwithstanding a provision in the charter or by-laws that no transfer shall be complete or effectual without registration.

In *Smith* v. *Railroad*, 91 Tenn., 221, 238, Lurton, Judge, says: "The rule requiring transfer on the books of the company, by the well-settled line of decisions in this State, and by the great weight of authority in the Courts of America, is a rule made solely for the benefit of the company. By it the company is enabled to know who are entitled to

vote, and to whom to pay dividends.'' The title of
the transferee is perfect, as between himself and the
former holder, and he is entitled, upon presentation
to the corporation of his certificate, to have himself
registered on its books as the real owner; it is in-
choate as to the corporation only, until the transfer
and registry on the books of the corporation has
been made. What are the possible consequences of
an omission to register the transfer of stock on the
books of the corporation, it is unnecessary here to
inquire, because nothing was done by the Bethel Hotel
Company which in any way affected the rights of
those holding its stock; and complainants, as the
assignees of Frierson, acquired such title to and in-
terest in the stock, as could not be affected or im-
paired by any act or omission of his.

Defendant, Webster, both for himself and for the
other defendants represented by him, relies, in his
answer, upon laches, as a defense to the relief asked
by those of the complainants who obtained the cer-
tificates of stock they hold prior to September,
1885. It is difficult to see how this defense can
avail them. It is argued that Frierson, having
claimed, used, and managed the property of the
Bethel Hotel Company as his own, with the knowl-
edge of complainants, and without objection from
them, for about seven years before the institution
of this suit, they are subject to the imputation of
laches, and cannot, for that reason, have relief.

''It is an old principle that a Court of Equity

will not enforce stale demands where a party has
slept upon his rights, and acquiesced for an unrea-
sonably long time. Laches and neglect are always
discountenanced.'' Lord Camden in *Smith* v. *Clay*,
3 Bro. Ch., 640. The doctrine rests upon the
broadest equity. Lapse of time obscures all human
evidence, and often makes it impossible to discover
the truth. Where the chances of establishing the
truth are greatly impaired by lapse of time, it
would be obviously unjust to enforce a demand after
many years of delay. And so, where a party had
done something, or had spent money, or altered his
situation, in the belief, generated by the delay and ac-
quiescence of his adversary, that he had the right so
to act, a Court of Equity will not interfere. But de-
lay alone, unaccompanied by other circumstances, will
not necessarily preclude relief. In every case where
the defense is founded on mere delay, that delay, of
course, not amounting to a bar of any statute of limi-
tations, the validity of that defense must be tested
upon principles substantially equitable. Two circum-
stances, always important in such cases, are, the length
of the delay, and the nature of the acts done during
the interval, which might affect either party, and
cause a balance of justice or injustice in taking one
course or the other.

The doctrine of laches, as understood in Courts
of Equity, implies injury to the party pleading it as
a defense. Where the situation of the parties has
not been altered, and one has not been put in a worse

condition by the delay of the other, the defense of laches does not generally apply. In *Paschall* v. *Henderer*, 28 Ohio St., 568, 580, it is said: "What constitutes a stale equity is a vexed question, hardly susceptible of an accurate definition. Length of time alone is not a test of staleness."

"Laches," says the Supreme Court of Virginia, "in the assertion or prosecution of a claim, is not always enough to defeat it. The laches must be such as to afford a reasonable presumption of the satisfaction or abandonment of the claim, or such as to prevent a proper defense, by reason of the death of parties, loss of evidence, or otherwise." *Tazewell's Exr.* v. *Sanders' Exr.*, 13 Gratt. (Va.), 354, 362.

In *Wollaston* v. *Tribe*, L. R., 9 Eq., 44, 50, a bill was brought in 1868 to set aside a marriage settlement executed in 1858, on the ground of fraud and mistake. Lord Romilly, M. R., said: "Great stress was laid on the lapse of time, but I think nothing of that, because all the persons are in the same state now as they were then. If there had been any dealing with an altered state of matters, that might have raised a question, but there is nothing of that sort." So, in the present case, we are not dealing with "an altered state of matters." The status is unchanged. Frierson was not induced to do anything or to omit anything to his hurt, by the alleged acquiescence or delay of complainants. In truth, it seems to us, that Frierson's use and management of the company's property was in no

sense inconsistent with the rights of complainants, as transferees and holders of its stock. His repeated renewals of the debts for which the stock was pledged, was a recognition, on his part, of the continued existence of the corporation, and of its title to the property. Its property was what gave value to the stock, and it was, undoubtedly, in reliance on the continued ownership thereof by the Bethel Hotel Company, that the complainants consented to renew their loans and retain the stock as collateral.

After what has been said, it is hardly necessary to notice the plea of the statute of limitations interposed by defendants. There are a number of assignments of error by defendants, based upon the idea that the Bethel Hotel Company was dissolved. It suffices to say, that, having found that the corporation was not dissolved, these assignments must be overruled.

The debts of the Second National Bank and of S. W. Warfield, administrator of Mrs. Francis, were attacked by defendant, Webster, for usury. The notes held by the bank were executed by Aiken and Mayes, but the debt was really owing by Lucius Frierson. These gentlemen were original indorsers, but after a number of renewals of the paper and some payments, Frierson became insolvent, and they then executed their own notes for the balance, without his name appearing on them. It was understood by all parties, however, that the debt was Frierson's. It was found to be a fact that interest had been

paid on both debts in excess of the legal rate. As to the debt due the Second National Bank, the Chancellor decreed that by charging and accepting usury the bank had forfeited all right to interest, and the payments made by Frierson on account of interest were applied in reduction of the principal. The Chancellor decreed, also, that the usurious interest paid on the Francis debt should be applied on the principal.    The Chancellor was wrong.    It is settled, by a multitude of decisions, that the right to plead usury is a privilege personal to the debtor.    27 Am. & Eng. Enc. of L., 949, note 4.    In one case the defense of usury was likened to that of infancy. *Ramson* · v. *Hays*, 39 Mo., 445.

The exception to the rule embraces the debtor's sureties, guarantors, heirs, devisees, and personal representatives, and they are permitted to plead usury on the grounds of privity or common interest. *Cole* v. *Hills*, 44 N. H., 227; *Loomis* v. *Eaton*, 32 Conn., 550; *Goodhue* v. *Palmer*, 13 Ind., 568; *Cramer* v. *Lepper*, 26 Ohio St., 59; *Merchants' Exchange Nat. Bank* v. *Commercial Warehouse*, 49 N. Y., 635. In the last case the exception to the general principle is stated in these words: "All privies to the borrower, whether in blood, representation, or estate, may, both in law and equity, by the appropriate legal and equitable remedies and defenses, attack or defend against any contract or security given by the borrower which is tainted with usury, on the ground of such usury, where such contract or security affects

19—12 P

the estate derived by them from the borrower.'' It would seem that an assignee under a deed of trust for the benefit of creditors, or an assignee in bankruptcy, would fall within the exception, and could plead usury to a debt which was entitled to participate in the assets conveyed to them, on the ground of privity in estate. *Stein* v. *Swenson*, 44 Minn., 208, 222; *Nance* v. *Gregory*, 6 Lea, 343. By the Code, § 2712, a judgment creditor is also allowed to sue for and subject usury paid by his debtor to the satisfaction of his debt. But no other than a judgment creditor can do so. *McKinney* v. *Hotel Co.*, 12 Heis., 104.

The exception does not seem to have been extended beyond the limits above indicated. The reason and policy of the statute against usury is the protection of borrowers against the oppressive exactions of money lenders, and, to promote and sustain that policy, it is not necessary that other persons than the victim, or those standing in legal privity with him, should be given the benefit of the statute. Defendant, Webster, does not fall within the exception to the general rule that a debt can be purged of usury only by the debtor. He is not a creditor of Frierson, but simply a trustee for certain creditors, none of whom appear to be judgment creditors. He is not such an assignee as, upon the ground of privity with the assignor, might have the right to attack a debt for usury. He holds, as assignee, no property chargeable with the payment

of the usurious debts in common with other debts. If the debts owing to the Second National Bank and Mrs. Francis were included in the deed of trust to Webster, it might be his duty to relieve the trust property to the extent of the usury paid on those notes. The assignee, in such case, holds the trust property for the benefit of the creditors named in the assignment, and it might be his duty to them to protect it from illegal burdens. But, as we have seen, the deed of trust executed by Frierson conveyed to Webster nothing except his interest in the W. D. Bethel stock. Webster became, thereby, the assignee of $61,000 of stock in the company for the benefit of the creditors named in the trust deed, but acquired no interest in the property of the corporation itself. Neither did he acquire any interest in the surplus value of the stock held by the bank and Mrs. Francis as security for their debts; that belonged to Frierson. It was a matter of no concern, therefore, to Webster, trustee, whether the debts of the bank and Mrs. Francis were tainted with usury or not. The amount going to him, as assignee of the Bethel stock, upon a final winding up of the Bethel Hotel Company, and distribution of its assets among the stockholders, could not be affected one way or the other by the fact that the debts of the bank and Mrs. Francis were tainted with usury. Any surplus that might remain, after paying them in full, would go to Frierson. It is clear, therefore, that Frierson alone was interested,

and no one but him could raise the question of usury, and this he has not done. There is also another ground upon which it must , be held that the debt of Mrs. Francis cannot be attacked for usury. This debt was reduced to a judgment in April, 1892. It has been held in this State that relief against usury will not be granted in equity after a judgment at law upon the debt.. If the debtor has had his day in Court, and failed or neglected to set up the defense of usury, the judgment is final and conclusive. *McKoin* v. *Cooley*, 3 Hum., 561; *Goff* v. *Dabbs*, 4 Bax., 300.

It is hardly necessary to add, after what has been said, the Chancellor was in error when he decreed that the Bethel Hotel Company be dissolved. He had no power in this case to decree a dissolution. That could be done only by suit instituted by the State for the purpose. The most that the Chancellor could do was to wind it up and distribute its assets. It was thought by the Court of Chancery Appeals that the Bethel Hotel Company had not been brought before the Court by proper service of process, and, it being deemed necessary for complete relief that this should be done, it was ordered that steps be taken, on the remand of the cause to the Chancery Court of Maury County, to bring the company before the Court. We think the Court of Chancery Appeals is mistaken; the Bethel Hotel Company has been sufficiently served with process, and is now before the Court. The executive

officers of the company last elected, were, W. D. Bethel, president, and Lucius Frierson, secretary. They hold over until the election of their successors, and were the president and secretary respectively, of the company when the original bill was filed, and are yet. Process was served on them, and they have severally filed their answers. We think service of process on them was all that could be had, and must be regarded as having been made on them officially as well as individually. We hold, therefore, that the Bethel Hotel Company was properly before the Court. In all other respects the decree of the Court of Chancery Appeals is affirmed. The cause will be remanded to the Chancery Court of Maury County for further proceedings.