## In re ROANOKE FURNACE CO.

(District Court, E. D. Pennsylvania. January 23, 1909. On the Merits, January 27, 1909.)

### No. 8,580.

1. BANKRUPTCY (§ 318*) — CORPORATIONS — PROVABLE CLAIMS — ATTEMPTED TRANSFER OF CONTRACT TO CORPORATION BY OFFICER.

The president of a furnace company, who owned the greater part of its stock and was also lessee of certain iron mines, entered personally into a contract with claimant to mine ore from such mines and deliver the same to his order on board cars. He subsequently wrote and signed a contract between himself and the company by which he assigned to the company all his rights under the contract with claimant, and which provided that the company should indemnify him against any liability thereon. The seal of the corporation was not placed on such purported agreement, nor was it authorized by the directors. The ore mined by claimant was shipped to and used by the company, and claimant made out bills in its name which were presented to and paid by the president until both he and the corporation were adjudged bankrupt, both having been insolvent at the time the contract was made. *Held*, that he had no power to so bind the corporation, and that claimant did not thereby become its creditor for a balance due him which he was entitled to prove only against the estate of the president.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 318.*]

2. PRINCIPAL AND AGENT (§ 143*)—RIGHTS AND LIABILITIES AS TO THIRD PERSONS—RATIFICATION—ACTS CAPABLE OF RATIFICATION.

· A contract made by a person in his own name and on his own behalf cannot be made the contract of another as principal by an attempted ratification of the act as that of an agent.

[Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. § 143.*]

3. CORPORATIONS (§ 426*)—REPRESENTATION BY OFFICERS—RATIFICATION.

An officer of a corporation cannot by his own act ratify on behalf of the corporation a contract made by him without authority.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1707; Dec. Dig. § 426.*]

In Bankruptcy. On certificate of referee concerning re-examination of claim of Thomas L. Woodruff.

See, also, 152 Fed. 846.

Charles F. Eggleston and Turner K. Hackman, for claimant.

John Dickey, Jr., Arthur G. Dickson, and Samuel W. Cooper, for trustee.

J. B. McPHERSON, District Judge. 1. The motion of T. L. Woodruff, claimant, filed on December 28, 1908, praying the court to dismiss the trustee's petition (which does not seem to have been presented until December 30th), in which a special order granting a petition for review of the referee's decision is asked for nunc pro tunc, is hereby refused.

2. In my opinion, the referee did not make a final order, allowing the claim of T. L. Woodruff as a lien creditor entitled to priority of payment, until September 2, 1908. Upon consideration of the trustee's motion for leave to file a petition to review that order, and the claim-

ant's answer thereto, it is ordered that the trustee have leave to file now in the District Court the petition for review that has already been presented to the referee, with the same effect as if it had been filed with him within 10 days from September 2, 1908.

As the referee's record has in fact been duly certified to the court, and a full argument has been had upon the questions raised by his decision, no further action by the referee is necessary.

## On the Merits.

The report of the learned referee thus states the facts upon which he bases his conclusion that the claimant is a creditor of the bankrupt corporation:

"Chester R. Baird, trading as C. R. Baird & Co., and having his principal office in the city of Philadelphia, was the owner of two iron furnaces at Roanoke, Va. These furnaces were conducted by him under the firm name of Roanoke Furnace Company. In December, 1899, Baird secured a charter of incorporation for the Roanoke Furnace Company, at Roanoke, and entered into an agreement with the corporation whereby he sold to it all of his right, title, and interest in the furnace plant formerly operated by the Roanoke Iron Company at Roanoke, Va., in consideration of the transfer to him and his nominees of all of the 5,000 shares constituting the capital stock of the said corporation. Of these shares, according to the said agreement, Chester R. Baird received 4,969, the balance of 31 shares being distributed among four other persons. Baird and his four associates were elected directors, and he became its president. The Roanoke Furnace Company was in fact, although not in law, a corporation sole, and Chester R. Baird, as is amply demonstrated by the letters that passed between him and C. E. L. Hatch, the general manager of the Roanoke Furnace Company, exercised complete control over the affairs of the said company.

"Woodruff, the petitioner, entered the employ of Baird some time in 1899 at Roanoke, and he continued in the employ of the Roanoke Furnace Company, unincorporated, until December, 1899, the date of its incorporation, and thereafter until June, 1900, when he resigned and engaged in the work of furnishing ore for the furnace during the months of June, July, and August, 1900.

"On August 30, 1900, Woodruff and Baird entered into an agreement which became the basis of the claim in this proceeding. This agreement recited the fact that Baird was the owner or lessee of the Griffin, Hibernia, and Vesuvius iron ore mines, and of the Buchanan limestone quarry, and that Woodruff was the lessee of the Rye Valley iron ore mines, and the parties agreed that Woodruff should mine the ore at Baird's mines for Baird, and sell and deliver the ore from his (the Rye Valley) mines to Baird; that Woodruff should have the right to use all the machinery and appliances at Baird's mines and quarry, and should deliver the ore and limestone from the Baird mines on the cars of the Norfolk & Western Railroad, and, in the case of the Griffin mines, transport the loaded cars to the junction of the line of the Norfolk & Western Railroad. The agreement then provided for terms of payment, deductions or increases on account of deficiency or excess in metallic iron in the ore, method of calculating the grade of the ore, etc.

"Woodruff agreed to purchase from Baird all mining tools, live stock, and mining supplies then on hand, and it was finally agreed that the intention of the agreement was that Woodruff should not receive any estate or interest in the mines and quarry owned or leased by Baird, or in the ore and stone taken therefrom, but that he, the said Woodruff, should be simply an independent contractor for the purpose of mining the ore and quarrying the stone. Acting under this agreement, Woodruff took complete charge of the mines, mined the ore, quarried the stone, and shipped the same to the Roanoke Furnace Company at Roanoke, Va., pursuant to Baird's orders.

"It was clearly the intention of Baird to make this contract for the benefit of the Roanoke Furnace Company. When the contract was found by

166 F.—60

the trustee among the papers of the Roanoke Furnace Company, it was found in an envelope indorsed by Baird. with these words. inter alia, 'Ore for Roanoke.' On October 13, 1900, Baird drew up a paper between himself individually and himself as president of the Roanoke Furnace Company, wherein, after reciting that in the execution of the contract of August 13 (30) 1900, between Woodruff and himself, he 'acted for the use and benefit of the said Roanoke Furnace Co.,' he therefore assigned to the company all his right, title, and interest in the agreement, and the company, in consideration of the assignment agreed to hold him, the said Baird, harmless on all of the covenants and agreements made by him in the said contract with Woodruff.

"This assignment was duly acknowledged by Baird before a notary public, but contains no acknowledgment by him as president of the corporation. nor is the seal of the corporation attached thereto, nor was there any evidence offered of any formal action of the corporation to authorize Baird as its president to enter into this agreement and to bind the corporation as set forth therein. It is quite obvious that the neglect of these formalities was an oversight. for Baird was substantially the whole corporation, and could unquestionably have had the necessary formalities passed in order to give apparent validity to the agreement, in so far as the same was intended to bind the furnace company.

"On the same day, to wit, October 13, 1900, Baird assigned to the Roanoke Furnace Company his leases for the various mines named in the contract with Woodruff. In the assignment of the lease for the Hibernia mine there is a recital that the premises were purchased by Baird 'with the money and for the use and benefit of the said Roanoke Furnace Co.' And in the assignment of the lease for the Vesuvius mine there is a similar recital. Apparently an attempt was made on this date by Baird to separate his interests from those of the furnace company, and to place evidence of such a separation of interests on record.

"Baird, during all this time, had other operations of a similar nature in Pennsylvania and New York, and his various interests were separately incorporated, and all of them, to wit, the Roanoke Furnace Company, the Catasaqua Rolling Mill Company, the Danville Rolling Mill Company, the Elmira Steel Company, the Emporium Furnace Company, and the Fullerton Rolling Mill Company, went into bankruptcy at about the same time that he did, and were all before me as referee. The affairs of these various interests were almost hopelessly intermingled, and it required years of work in order to disentangle them, and at least two of the estates are now, after the expiration of upwards of seven years since the date of filing the petitions, still open, with very serious questions as to the rights of these estates to the assets held by their respective trustees still undetermined.

"Whether Baird's action in his attempt to assign his interest in the Woodruff contract to the furnace company was a ratification of the original purpose, or merely an afterthought, it is certain that Woodruff, the other party to the agreement, interpreted it as a contract with the Roanoke Furnace Company. He tagged, shipped, and delivered the ore and limestone to the Roanoke Furnace Company, and the company received and used the same. The amounts of the shipments were determined by weights and analysis made by the furnace company. The weights were taken by the railroad company from figures given to them by the Roanoke Furnace Company. The monthly statements stipulated for in the contract were given to Woodruff by Hatch, general manager of the Roanoke Furnace Company, with whom Woodruff had all his dealings. Woodruff charged the ore, etc., on his books to the Roanoke Furnace Company, and he presented bills against the Roanoke Furnace Company to Baird at his Philadelphia office, the said office also being the office of the Roanoke Furnace Company.

"Woodruff continued to supply ore and stone to the Roanoke Furnace Company until about October 27th or 28th, when the mining stopped at the different mines operated by Woodruff under the above contract. On November 23d Woodruff filed a labor and supply lien in the corporation court of the city of Roanoke, Va., against the Roanoke Furnace Company for labor performed, services rendered, wages, supplies furnished to the company in the sum of $8,020.81, with interest, and claimed a prior lien to the extent of the

above sum upon all the personal property of the Roanoke Furnace Company other than that forming a part of its plant, and also a lien on all of the estate, real and personal, of the said company."

Upon these facts the referee reported that the claimant was a creditor of the Roanoke Furnace Company, and stated the reasons for his conclusion as follows:

"I am satisfied from all of the testimony:

"First, that Woodruff is a creditor of the Roanoke Furnace Company. While it is true that the original contract upon which his claim is based was made with C. R. Baird, trading as C. R. Baird & Co., all of the facts in the case point to the conclusion that it was not the intention of Baird to assume any liability by this contract; that it was Baird's purpose that the materials furnished and work done should be furnished and done for the Roanoke Furnace Company; that it was Woodruff's understanding of the contract that it was made for the benefit of the Roanoke Furnace Company, and that the Roanoke Furnace Company should be charged therewith; and that the Roanoke Furnace Company received the material and used the same.

"It is true that there does not seem to be any formal agreement on the part of the Roanoke Furnace Company whereby its obligation to Woodruff might be established; but, considering all the facts of the case, such form of agreement is, in my opinion, unnecessary to fix the liability of the furnace company. Informalities in the execution of the agreements whereby the Roanoke Furnace Company was to be benefited cannot be pleaded for the purpose of releasing the company from liability, for C. R. Baird was virtually the whole company; and if it can be clearly established that he was acting for the company, and that the company did in fact obtain the benefit of his act, then the liability of the company is established in equity, although the formal acknowledgment of such liability in the manner usually required by corporations is not at hand.

"Nor does it make any difference that the ore mined by Woodruff under the contract with Baird was, in the agreement of August 30th, specifically stated to be the property of Baird. The claim of Woodruff is not for the price of the ore, but for mining it, and although the ore might have been Baird's ore (though, as the subsequent assignment showed, it was really ore of the furnace company), it was obviously intended by Baird to go to the Roanoke Furnace Company, and as the Roanoke Furnace Company received it and credited Woodruff on its books, and as Woodruff charged the Roanoke Furnace Company on his books and submitted his bills to it, presenting them to Baird, its president, and as Baird by his subsequent agreements assigned not only his contract with Woodruff, but also his leases from the mines from which the ore was taken for the Roanoke Furnace Company, there is no doubt in my mind that the Roanoke Furnace Company is properly chargeable, and that by these facts Woodruff has become its creditor."

It must be admitted that it is not easy to determine with confidence when Baird was acting in his individual capacity, and when he was representing, or assuming to represent, the Roanoke Furnace Company. Probably the question can only be put to rest by a tribunal from whose decision no appeal will lie. In my own opinion, the weight of the evidence does not support the referee's conclusion, but requires a different ruling. The facts are not in dispute, but merely the proper inferences that should be drawn therefrom, and in such a situation the court is not bound by the ordinary rule concerning the force of a referee's finding. In my opinion, the chief objection to the report is that it fails to give sufficient weight to the contract of August 30th. This is a piece of evidence which is not at all ambiguous, and for that reason seems to be entitled to special weight. It deserves to be set out practically in full:

"This agreement made the 30th day of August, 1900, between Thomas L. Woodruff, of the city of Roanoke and state of Virginia, of the first part, and Chester R. Baird, trading as C. R. Baird & Co., of the city of Philadelphia and state of Pennsylvania, of the second part:

"Whereas the said Baird is the owner or lessee of the Griffin iron ore mines near Roanoke, Va., of the Hibernia iron ore mines, near Alisonia, Va., of the Vesuvius iron ore mines, near Vesuvius, Va., and of the Buchanan limestone quarry, near Buchanan, Va.:

"And whereas the said Woodruff is the lessee of the Rye Valley iron ore mines situated at the terminus of the Marion & Rye Valley Railroad, near Marion, Va.:

"Now this agreement witnesseth, that the said parties, in consideration of the sum of one dollar by each unto the other in hand well and truly paid at or before the ensealing and delivery hereof, the receipt whereof is hereby acknowledged, covenant and agree to and with each other as follows:

"(1) The said Woodruff shall mine the ore at the said mines of which said Baird is the owner or lessee, and quarry the limestone at the said Buchanan quarry, for the said Baird, and shall sell and deliver the iron ore from the said Rye Valley mines to the said Baird.

"(2) The said Woodruff shall work the said mines and quarry up to their full capacity or to such less extent as he may be requested so to do by the said Baird, or upon the request of the said Baird, the mining operations at any particular mine or mines or the quarrying operations at the said quarry shall be entirely stopped.

"(3) The said mining operations and quarrying, so far as the mines and quarry of which the said Baird is the owner or lessee are concerned, shall be carried on by the said Woodruff in a workmanlike and systematic manner, and so that the future operations thereof shall not be interfered with and in accordance with the stipulations of any lease under which the said Baird may hold them.

"(4) The said Woodruff shall have the right to use all of the machinery and appliances at the said mines and quarry of which the said Baird is the owner or lessee and he shall keep the same in the same good order and repair that they are now in (usual wear and tear alone excepted) and shall surrender the same to the said Baird upon the termination of this agreement in like good order and repair.

"(5) All of the said ore and limestone shall be delivered by the said Woodruff on the cars of the Norfolk & Western Railroad at the said mines and quarry, except the ore from the Rye Valley mines, which shall be put on board the cars at the mines on the tracks of the Marion & Rye Valley Railroad Co., and in the case of the ore from the Griffin mines, the said Woodruff shall transport the loaded cars from the mines to the junction of the line of the Norfolk & Western Railroad Co.

"(6) The said Baird shall pay to the said Woodruff for all iron ore and limestone mined and quarried at the following rates: (Here follow prices.)

"(7, 8) (Contain provisions for analysis of ore.)

"(9) In the event that the average monthly market price of iron according to the quotations in the 'Iron Age' for No. 2 foundry iron delivered in Philadelphia should advance $1 per ton, then the prices to be paid by the said Baird to the said Woodruff shall be increased 2% and so on according to every such advance, and in the event that the average monthly market price of iron according to the said quotations should decline $1 per ton, then the prices to be paid by the said Baird to the said Woodruff shall be reduced by 2% and so on according to every such decline. The present market price for such iron shall be taken as being $16 per ton.

"(10) The said Woodruff shall mine and ship from the said mines, if requested so to do by the said Baird, not less than 2,400 tons per month from the Griffin mines; not less than 800 tons per month from the Hibernia mines; not less than 2,000 tons per month from the Vesuvius mines; not less than 1,600 tons per month from the Rye Valley mines, and shall quarry and ship not less than 4,000 tons of limestone from the Buchanan quarry; and if any month's shipments of ore from any mine, together with any surplus over the monthly minimum shipped from said mine in previous

months and not theretofore credited to a minimum, shall not equal the said monthly minimum, then the price payable for all ore shipped during the said month, whether from the said mine or from any other mine, shall be reduced 5%, and likewise if the total of any month's shipments of limestone, together with any surplus over the monthly minimum shipped in previous months and not theretofore credited to a minimum, shall not equal the said monthly minimum, then the price payable for all limestone shipped during the said month shall be reduced 5%, provided, however, that the obligation, to ship the above named minimums shall become operative only from and after October 1, 1900.

"(11) Whereas the said Woodruff has contracted with the said Baird to construct a certain tram track, provided the said Baird furnishes the iron therefor, at the Vesuvius mines, for $850, and another tram track at the Hibernia mines, provided the said Baird furnishes the iron therefor, for $100, now upon the completion of the tram track at the said Hibernia mines, the price to be received by the said Woodruff for ore mined shall be reduced from $1 to 80¢ per ton, and upon the completion of the said tram track at the Vesuvius mines, the price shall be reduced from $1 to 65¢ per ton. The said tram tracks shall be completed by the said Woodruff within thirty days from the time at which the iron shall be furnished by the said Baird, and if the said tracks shall not be completed at the said time the price for the ore shall nevertheless be reduced to the amount payable upon the completion of the said tracks.

"(12) A ton as used throughout this agreement shall be a ton of 2,240 pounds, railroad weight.

"(13) The said Woodruff will purchase from the said Baird at a fair price to be hereafter agreed upon, all mining tools, live stock and mining supplies, including powder, coal, feed and hay for live stock, oil, etc., the purchase price being paid by having applied thereto 10% of the gross amount due by the said Baird to the said Woodruff for the monthly shipments made hereunder.

"(14) Settlement shall be made by the said Baird with the said Woodruff on or before the 10th day of each month for all ore received at furnaces during the preceding calendar month.

"(15) It is understood that the said Baird is to pay whatever royalty may be due to the owners in fee for all ore mined from the Griffin, Hibernia and Vesuvius mines, and the said Woodruff is to pay whatever royalty may be due for all ore mined at the Rye Valley mines.

"(16) The said Woodruff shall be indemnified and protected by the said Baird from all claims that may be made against him for the unavoidable consequences of said mining operations carried on at the mines owned or leased by the said Baird, it being understood and expressly agreed, however, that the said Baird shall in no wise be responsible for any damages caused by the negligence or the improper conduct of the said Woodruff or of his employés.

"(17) The said Woodruff shall be given the peaceful occupation of each of the said mines and quarry owned or leased by the said Baird, and in the event that the said occupation shall be disturbed by the said Baird or the owners of the said mines, except as hereinafter expressly provided, the covenants of the said Woodruff as to the mine or mines as to which his occupation shall be disturbed shall be cancelled and annulled.

"(18) The said Baird shall have the right, by himself or his authorized agent or agents, to inspect the operations of the said Woodruff at any time or times during the continuance of this agreement, but he or they shall not unnecessarily interrupt the said operations in so doing, and he or they shall have no control whatsoever over the said operations, but the same shall be under the exclusive control and direction of the said Woodruff and his authorized agents.

"(19) The said Woodruff shall not assign this contract in whole or in part without the consent of the said Baird.

"(20) The term of this agreement shall be one year from the 1st day of September, 1900.

"(21) Upon the failure of the said Woodruff to perform any of his undertakings herein contained, the said Baird shall at once have the right to terminate this agreement and to prevent the further operation by the said Woodruff of the said mines and quarry owned or leased by the said Baird.

"(22) Upon the termination of this agreement, whether by reason of the expiration of its period or by reason of its prior termination by the said Baird under the exercise of the rights hereinbefore given him, the said Baird will purchase from the said Woodruff, at a fair price to be hereafter agreed upon, all mining tools, live stock and mining supplies, including powder, coal, feed and hay for live stock, oil, etc., then on hand.

"(23) It is the intention of the parties to this agreement not to give the said Woodruff any estate or interest whatsoever in the mines and quarry owned or leased by the said Baird or in the ore and stone taken therefrom, but to make the said Woodruff simply an independent contractor for the purpose of mining the ore at said mines and quarrying the stone at said quarry.

"(24) It is understood that where the word 'silica' is used above, same is understood to mean 'insoluble residue.'

"In witness whereof the parties hereto have hereunto set their hands and seals.                                     Thomas L. Woodruff.   [Seal.]
                                        "Chester R. Baird.      [Seal.]"

"Sealed and delivered in the presence of:
    "Nicholas H. Wagner."

It cannot be doubted that on the face of this contract Baird was acting for himself, and that the Roanoke Furnace Company was not bound by any of its covenants. Neither is there a word in it which gives to the company any right to benefit by its provisions. Baird was dealing mainly with his own property, and was apparently concerned solely with making the ore and limestone available, either for use or for sale. After this was done and the material was delivered on board the cars of the Norfolk & Western Railroad Company, he had full power to determine its destination. He might use it himself, or direct it to be shipped to any one of the plants in which he was interested, or he might sell it to other persons and put the proceeds into his pocket. No doubt he chose that it should be used by the Roanoke Furnace Company, presumably believing that this would be most to his advantage; but his choice was merely the exercise of the right belonging to him as owner, which was in nowise interfered with by the written agreement. The leases were his; the ore and stone were his; Woodruff was merely employed to prepare the minerals for the market or the furnace, and was not interested in Baird's decision where they were to go. It was Baird who was bound to pay the sums specified in the agreement, and Woodruff had no legally enforceable right under the contract against any other person, even if such person did receive and use the minerals by Baird's direction and consent. Before this express written contract is altered so as to substitute the Roanoke Furnace Company in place of Baird as the party liable, there should, I think, be clear and distinct testimony that all parties in interest agreed to so important a change. In my opinion, such testimony is lacking. Almost, if not quite, all the testimony that is relied on by the claimant to prove that the furnace company adopted the contract and became bound by its obligations is equally consistent with the view that Baird continued to be the real, as he was unquestionably the apparent, party in interest, and that the furnace company was merely receiving the ma-

terial because he so directed. Thus, the facts that the ore and stone were received and used by the company; that the cars were tagged and billed in the company's name; that the company sent to Woodruff daily reports of the weights and numbers of the cars received, with monthly statements of totals; that bills charging the company were presented to Baird without objection on his part to their form; that the company credited Woodruff with the ore upon its books; and that Baird marked the envelope containing the contract "Ore for Roanoke" —all these facts, I think, and some others that might be mentioned, are as consistent with one view of the matter as with the other.

The difficulty of disentangling Baird's individual acts from such acts as he may have intended to perform as a representative of the furnace company meets us everywhere in the testimony. Baird's office and the office of the furnace company were in the same rooms; the correspondence between them is full of indications that the business of the two concerns was constantly overlapping; Baird paid money to the claimant on account of material delivered to the furnace company after August 30th, and continued after October 10th to direct shipments under the contract. (Shipments ceased on October 27th.) In short, the fact is unmistakably evident that the enterprises in which Baird was interested were so related to each other that it is nearly, if not quite, impossible to draw the line of demarcation with confidence, so as to assign a particular transaction to its appropriate sphere. Apparently Baird made no serious effort to keep his operations separate as long as he was able to keep afloat, but, as the end approached, he made an attempt to impress upon the contract of August 30th a construction which its language cannot be made to bear. The claimant's counsel admitted that the furnace company was insolvent within the meaning of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3418]) on and after August 30th, and it cannot be doubted that Baird was also insolvent at the same date. Nevertheless, on October 13th he undertook to convey to the furnace company the fee and leases of the mines and quarries referred to in the August agreement, and to assign his interest in that agreement to the same company. The assignment is as follows:

"This agreement made the 13th day of October, 1900, between Chester R. Baird, trading as C. R. Baird & Co., of the first part, and Roanoke Furnace Company, a corporation duly incorporated under the laws of the state of New Jersey, and authorized to do business in the state of Virginia, of the second part:

"Whereas the said Chester R. Baird, in the execution of the contract hereinafter referred to, acted for the use and benefit of the said Roanoke Furnace Company:

"Now this agreement witnesseth: That the said Chester R. Baird, in consideration of the premises, and of the covenants and agreements of the said Roanoke Furnace Company hereinafter contained, assigns, sets over and transfers, unto the said Roanoke Furnace Company all his right, title and interest in and to the agreement made and entered into on the 13th day of August, 1900, by and between Thomas L. Woodruff, of Roanoke, Virginia, and the said Chester R. Baird, trading as C. R. Baird & Co.:

"And this agreement further witnesseth, that the said Roanoke Furnace Company, in consideration of the said assignment, covenants and agrees to and with the said Chester R. Baird, to hold him harmless on all of the cove-

nants and agreements made by him in the said contract with Thomas L. Woodruff.

"In witness whereof the said Chester R. Baird has hereunto set his hand and seal and the said Roanoke Furnace Company has hereunto caused its corporate seal to be affixed. Chester R. Baird. [Seal.]

"Roanoke Furnace Co.,
"By Chester R. Baird, Prest."

"Sealed and delivered in the presence of:
"Jacob Mann."

This was in form a contract made by Baird with himself, and it should, I think, have little, if any, more effect than his ex parte declaration that he desired the agreement of August 30th to be construed in a particular sense. Of course, the assignment did not bind the claimant, who is not a party to it, and is not shown to have had any knowledge of it while he was working the mines and quarry. Neither did it bind the furnace company. The paper states that the corporate seal is affixed, but this was never done, and there was no corporate action authorizing or approving or ratifying the transaction. It is true that Baird was the controlling stockholder, and that the corporation was apparently treated as a negligible quantity, but I do not see how it is possible so to regard the company as a matter of law. It had a regular corporate organization, capital stock, and a board of directors; it was able to contract debts, and did contract them to a large amount; and, while Baird had control of the stock and could have enforced his will in any matter that required a stockholders' vote, he was only one of the board of directors, and it is not to be assumed without proof that the other directors would have always blindly followed his lead. No doubt, they might have followed it; I concede that this conclusion is probable; but, after all, it is no more than an assumption, which I think cannot be allowed to take the place of proof. The distinction between an individual and a corporation in which he is practically supreme, or between corporations so closely allied as to be nearly identical, may sometimes be difficult to draw; but as long as corporations are regarded by the law as distinct and separate entities, without regard to the personnel of their stockholders, the corporate organization cannot ordinarily be disregarded or treated as if it did not exist. The ownership of stock in a corporation is not to be confounded with ownership of its property. As was said by the supreme court in Humphreys v. McKissock, 140 U. S., on page 312, 11 Sup. Ct. on page 781 (35 L. Ed. 473):

"But nothing is more distinct than the two rights; the ownership of one confers no ownership of the other. The property of a corporation is not subject to the control of individual members, whether acting separately or jointly. They can neither incumber nor transfer that property, nor authorize others to do so. The corporation—the artificial being created—holds the property, and alone can mortgage or transfer it, and the corporation acts only through its officers, subject to the conditions prescribed by law."

See, also, Parker v. Bethel Hotel Co., 96 Tenn. 252, 34 S. W. 215, 216, 31 L. R. A. 706, in which the right of one who owned all the capital stock of a corporation to convey the corporate property was denied. The distinction between a company and its stockholders was also the subject of discussion before the House of Lords in Salomon

v. Salomon & Co., L. R. App. Cases (1897) 22. In the case now before the court, a majority stockholder undertakes to impose a liability upon the insolvent corporation by a so-called "assignment," in which he really seeks to transfer his individual obligations under a written contract from his own shoulders to the shoulders of the company, and he assumes to do this by declaring to himself that the transfer has been made. This is the essence of the matter, and this, I think, cannot be done. If I am right in so holding, the paper signed on October 13th may be wholly disregarded.

But, if it is to be considered at all, its form shows clearly to my mind that Baird recognized the contract of August 30th as binding him individually, and knew that he could not transfer his obligation thereunder to the furnace company. For he does not attempt to assign his obligation; he only assigns his "right, title and interest," etc.—that is, his property right, or beneficial interest; and he leaves his obligations to Woodruff untouched, merely taking the company's promise to indemnify him against Woodruff's enforcement of the covenants contained in the August contract. The company makes no promise to Woodruff; it does not even agree with Baird that it will pay Woodruff; it recognizes that Baird is the person to whom Woodruff is to look, and agrees that it will hold Baird harmless against such claims.

In a word, the agreement of August 30th, which is made the basis of the claim in controversy, seems to me to be decisive against it. In the mass of ambiguous transactions between Baird, Woodruff, and the furnace company, here is a definite fact, which cannot be lightly set aside. Around it may be grouped nearly, if not quite, all of these transactions, for they do not contradict it, but are consistent with its terms, although they would no doubt be also consistent with it if it bore a different meaning. But the only meaning it can be made to bear calls for Baird as the person with whom the claimant made his contract, and in my opinion, therefore, the claim in question has been presented against the wrong estate.

The claimant's counsel lays stress in his brief upon the doctrine of ratification in the law of principal and agent, and urges that the furnace company adopted Baird's act in making the August contract, and is therefore bound by it. "Ratification as it relates to the law of agency is the express or implied adoption of the acts of another by one for whom the other assumes to be acting, but without authority." 1 Am. Eng. Ency. Law (2d Ed.) 1181. The act must be done by the agent on account of some principal, not on his own account or on account of some third person. Where one buys in his own name for himself, another cannot adopt the transaction as principal. Id. 1188. The rule is thus stated in Clark & Skyles on Agency, § 102, p. 263:

"It is also essential that an act or contract, in order that it may be the subject of a ratification, shall have been done or entered into by the alleged agent as agent, and in the name or on behalf of the alleged principal. If an act or contract is done or entered into on behalf of one person, another person, who is a stranger to the transaction, cannot come in and by an attempted ratification take advantage of or become liable for or upon it, and the same principle applies where a person does an act or enters into a contract not intending to act as agent at all, but on his own behalf as principal"—citing many cases. See, also, Id. p. 340 (c), 372 (c).

Now there is no evidence except Baird's ex parte declarations that he was assuming to act on behalf of the furnace company in making the August contract, and these declarations (if they are competent at all) are positively contradicted by the contract itself, which is made by Baird individually on his own account and for his own benefit. Moreover, ratification by a corporation cannot be inferred from the acts of the very officer who did the unauthorized act. 21 Am. & Eng. Ency. Law, pp. 853, 854; 1 Am. & Eng. Ency. Law, p. 1183. "As a general rule, an agent cannot ratify an unauthorized act done by himself or his servants so as to bind his principal thereby." 1 Clark & Skyles, § 123, p. 298. Nearly all the acts relied on to prove ratification by the company were done by Baird himself or under his direction; if these are excluded, little, if anything, is left that could have weight in this behalf. There is no evidence whatever that what Baird was doing was known to, or authorized or approved or ratified by, the board of directors, and (as I have already said) the conclusion that he was assuming to act for the company must be drawn from his own declarations after his troubles became urgent, or it cannot be drawn at all.

If I am correct in what has been said, it is not necessary to consider the remaining questions that have been argued, namely, whether the referee should have allowed the claim to be amended, and whether (thus amended) it was entitled to priority as a labor and supply lien under the Virginia statute.

The referee's order is set aside, and the claim in controversy is disallowed.