**EFFECT OF ACQUIESCENCE IN WRONGFUL CONDUCT.**

Circuit Court of Cuyahoga County.

LOUIS N. GROSS V. J. R. WIENER, THE WIENER BROS. COMPANY, AND THE INTERVALE FRUIT COMPANY.

Decided, January 13, 1913.

*Equity—When Doctrine of Laches Bars Equitable Relief.*

Acquiescence in the wrongful conduct of another by which one's rights are invaded, in order to preclude the injured party from obtaining equitable relief to which he would be otherwise entitled, must be voluntary, with knowledge of the wrongful acts and their injurious consequences, and it must last for a reasonable length of time, so that it will be inequitable to the wrongdoer to enforce equitable remedies against him.

*White, Johnson & Cannon,* for plaintiff.
*Kline, Tolles & Morley,* contra.

MEALS, J.; WINCH, J., and MARVIN, J., concur.

Some time in March, 1909, the plaintiff, Louis N. Gross, entered into a contract with the Wiener Bros. Company, a corporation organized under the laws of the state of Ohio, of which J. H. Wiener was a principal stockholder and treasurer, for the purchase of 208 shares of the capital stock of the Intervale Fruit Company, a corporation also organized under the laws of the state of Ohio.

It is claimed by the Wiener Bros. Company that this contract was made on the 10th day of March, and by Gross that it was made on the 19th day of March, 1909, but in our opinion this dispute is unimportant, as the knowledge which Gross had of the facts on which he relies for relief in this action, were substantially the same on both dates.

This action is brought by Gross for the rescission of this contract, and the prayer for relief is founded upon the following allegations of fraud and misrepresentation on the part of the defendants in the making of the contract:

First.   That the farm owned by the Intervale Fruit Company, a one-half interest in which Gross sought to buy in the purchase

of the stock of the company, contained six hundred and twenty-six acres.

Second.    That the farm was worth $60,000.

Third.    That there were 50,000 trees, practically all three, four and five years old.

Fourth.    That the title of the company was clear.

Fifth.    That the Wiener Bros. Company, which owned two-thirds of the outstanding stock of the company, had been offered $27,000 for one-half of their interest.

Sixth.    That the canning factory located on the farm and belonging to it, had an estimated capacity of 30,000 No. 3 cans every ten hours.

Seventh.    That the canning factory cost $3,800 to build.

Eighth.    That the canning factory employed eighty hands.

Ninth.    That the fruit company shipped twenty-seven cars of fruit in the season of 1908.

Tenth.    That the fruit company paid dividends of 30% in 1908.

Eleventh.    That orchard A contained 12,000 peach trees.

Twelfth.    That orchard B contained 3,700 apple trees, and bore a full crop in 1908.

Thirteenth.    That orchard C was the finest plum orchard in the south, and had borne three crates to the tree.

Fourteenth.    That orchard D contained ten acres of land planted in pecan trees.

Fifteenth.    That orchard E contained forty acres of apple trees.

Sixteenth.    That parcel F contained twenty-five acres of strawberries.

Seventeenth.    That orchard G contained 5,000 peach trees.

Eighteenth.    That orchard H contained 600 pear trees.

Nineteenth.    That orchard I contained 15,000 Elberta peach trees, and averaged one crate to the tree in 1908.

Twentieth.    That orchard J contained 7,000 peach trees.

Twenty-first.    That orchard E contained 4,000 peach trees.

Twenty-second.    That orchard L contained 8,000 plum trees.

Twenty-third.    That parcel M contained ten acres of strawberries.

Twenty-fourth. That orchard N contained 4,000 peach trees, and in 1908 bore a half crop.

Twenty-fifth. That orchard O contained 20,000 peach trees.

Twenty-sixth. That orchard P contained twenty acres of peach trees.

Twenty-seventh. That parcel Q contained eight acres of peach trees.

Twenty-eighth. That parcel R contained thirty acres of walnut, filbert and pecan trees.

It may be important to note that, with the exception of representations as to numbers 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10, the several representations referred to the number of trees on the farm.

Representation No. 3 refers to the age of the trees on the farm, and it is substantially conceded that the value of the farm rested upon these two considerations.

For reasons which need not be recounted here, representations numbers 1, 2, 4, 5, 7, 8 and 9 are practically eliminated from the case. There remains, therefore, for our consideration, representations numbers 6 and 10, and those relating to the number and age of the trees on the farm.

We therefore have before us the representations, first, referring to the number and age of the trees on the farm; second, the capacity of the canning factory; and, third, that the company paid a dividend of 30 per cent. in 1908.

The falsity of these representations is denied by the defendants, and for their further defense they allege that Gross made no claim that he had been deceived in the making of the contract until January 10, 1910, when, accompanied by Mr. Neff, he went to Akron and demanded of the Wiener Bros. Company a rescission of the contract, and that by his conduct in the iterim he ratified the transaction and is now estopped to complain.

What are the facts and circumstances attendant upon this transaction?

The record is voluminous, and within the narrow limits of this opinion it will be impossible to refer to more than the principal facts of the transaction.

Gross and Wiener had been intimate friends for perhaps a dozen years. Late in January or early in February, 1909, Gross

called upon Wiener at his office in Akron, as had been his custom when visiting that city.

In the course of their conversation at this time, Mr. Gross said to Mr. Wiener that he was tired and contemplated going south for a short rest, and incidentally for the purpose of viewing and perhaps buying a tract of land at Palatka, Florida, for his son, whom he wished to interest in agriculture. Wiener asked Gross how soon he intended going, saying, if you will let me know a week or ten days before you go, I am quite sure that I can go along with you, as I have been working very hard and need a little rest myself.

A short time later Gross communicated with Wiener by telephone relative to the time of their departure. At this time it was arranged that they should leave Akron for the South on Saturday evening, March 6th.

At Akron, on the evening of the 6th, at Wiener's home, the conversation relative to the purchase of lands in Florida by Gross was renewed. Wiener assured Gross of his faith in southern farm lands. Among other things he said to Gross, in substance, you know that I had very little money. A short time ago I invested a small amount in a small parcel of land in Georgia, the profits from which I reinvested in other lands adjacent thereto, until now, as a result of the accumulations from my original investment, I have $60,000 or $70,000 worth of farm lands in that state.

He then suggested to Gross that they stop over at his farm and "spend a day or two there," to which Gross acceded, saying, however, that he did not think they would wish to remain there any great length of time. Wiener said, in substance: "Well, when we get there, if we find it is not as pleasant as we want it, we will not stay, and it won't take us much out of our way to stop, as it is on the route to Florida."

At this time Wiener had in mind the selling of the Wiener Bros. Company's interest in the farm, as is evidenced by the facts which will be adverted to later in this opinion.

After dinner they left Akron together and arrived at Chattanooga at 7 P. M. Sunday, March 7th.

En route from Cincinnati to Chattanooga the conversation turned again to farms and farming in the south. Gross again spoke of his boy, who was then about fourteen years of age. He said he would like to educate him in an agricultural college and make a farmer out of him, as he felt that he would be much more contented at farming than he would be in the mercantile business, and that he intended to look at some lands at Palatka, Florida, with the intention of purchasing the same if they suited him. In the course of the conversation Wiener encouraged Gross in this intention, saying, among other things, that his was a most excellent idea.

After some further conversation on this subject Wiener said:

"Now, Gross, what is the matter with your buying an interest in my farm instead of going away down to Florida? I have $60,000 or $70,000 worth of property out there, and, as you are aware, I never had much money, but I bought a small part of the place which I now have, and with the profits bought more, until now I have six hundred and twenty some odd acres of land worth more than $30 an acre. There are over 50,000 fruit-bearing trees upon it, all young, four or five years old, and a good many of them not over two years old that I put out myself, and this place has a most promising future for it. If you want your son to become a farmer, I think here is a most elegant proposition for you to go in on. Very recently I turned down an offer of $27,000 for a half interest in my holdings in the farm.".

At this juncture Wiener withdrew a packet of papers from his traveling bag, from which he handed a letter to Gross from one Byrne, in which Byrne conditionally offered $27,000 for a half interest in the farm. Wiener also showed Gross a copy of his reply to Byrne, in which the Wiener Bros. Company offered to take $30,000 for their interest in the farm, and represented, among other things, that the property was worth from $60,000 to $65,000; that there were 50,000 trees on the place, and that practically all of them were three, for and five years old and worth at $1 a tree; also that the farm consisted of 626 acres of land worth from $30 to $35 an acre, with buildings on the Tompkins farm, which was one of the two farms composing the entire tract, worth alone $10,000.

And thus the conversation continued, off and on, until they reached Chattanooga, Wiener seemingly leaving nothing unsaid which, to his mind, would induce his friend Gross to purchase one-half of his company's interest in the farm. Gross regarded Wiener as his friend, and believed implicitly all that Wiener said to him on the subject of the farm and its value.

At Chattanooga they met, as if by appointment of Wiener, one Healey from Port Clinton, who was represented as a fruit buyer and who accompanied them to the farm, adding his mite at times, we suppose, in swelling the worth of the Intervale farm.

The party left Chattanooga on Monday, March 8th, stopping over night at Summerville, Georgia. On Tuesday morning, March 9th, they drove to the farm some five miles away. Adopting the language of counsel for the defendant, they found the peach trees in full bloom, which presented a most beautiful sight. It was perhaps ten o'clock when they arrived at the place. An hour or more was spent in walking in the orchard and about the place, not going very far away, however, from the farm house. Luncheon was served at about 12:30 at the farm house, after which the party remained in and about the farm house, and the grounds immediately surrounding the same, until early the following morning, when they returned to Summerville.

While at the farm Wiener convinced Gross of the truthfulness of the representations which he had made to him concerning the extent and value of the farm, and of the advantages in owning a share in the same, and had successfully induced Gross to agree to purchase a half interest in the farm for the sum of $15,000. Some debts were outstanding against the place which were pressing. Wiener explained to Gross that it was because of these debts and his need of money that he entertained at all the thought of disposing of any part of the farm, as he regarded the investment a capital one. Then, too, he added that he was glad to take Gross into partnership with him in a good thing, because of the long-standing friendship existing between them.

On their arrival at Summerville on the morning of March 10th, they went to the office of C. B. Rivers, an attorney, who drafted an agreement for them, which in part is as follows: ·

"For and in consideraion of the sum of $15,000, said Wiener Bros. do herby transfer, assign and convey unto the said Louis

N. Gross one-half of all the stock of the Intervale Fruit Company, incorporated, of Akron, Ohio, and agree to deliver to him the usual certificates for said stock by shares, with all and full the rights and privileges of every other shareholder of such stock of equal amount.''

And further, the agreement provided the sum of $15,000 was to be paid according to the terms of a further agreement between the said Louis N. Gross and J. Henry Wiener, president of the said the Wiener Bros. Company. What this further agreement should contain does not appear, at least, from this instrument, but we suppose reference is here made to the agreement to be and which was made later. The agreement was signed by the Wiener Bros. Company, by J. H. Wiener, treasurer, and Louis N. Gross.

For the purpose of meeting certain pressing claims against the company, as above stated, and in accordance with an arrangement made by and between Wiener and Gross at the farm on the previous day, Gross paid at this time $760, which was credited on the contract.

Having concluded their business in Summerville they continued on their journey. About March 21st, they returned home, after which Gross was elected secretary and treasurer of the Intervale Company and assumed the management of the same. He had an examination made of the title to the property; he inquired into the indebtedness of the company and in other ways set about to familiarize himself with the business of the company.

On the 19th of April the transaction was finally closed. Another contract was made and signed by Gross who gave his notes to the Wiener Bros. Company in payment of the purchase price.

In this latter contract it was recited that the Wiener Bros. Company ''this day sold and transferred to the second party 208 shares of the capital stock of the Intervale Fruit Company, one-half of the outstanding capital stock of said company, for the sum of $15,000, said transfer to take effect as of the 10th day of March, 1909.''

As we have previously observed, it is contended by Gross that the true date of the contract was April 19, or the day on which

this latter contract was made, and by the Wiener Bros. Company that it was March 10. In support of his claim Gross cites the fact that on March 10th, J. H. Wiener was without authority to execute a contract on behalf of the Wiener Bros. Company, later ratified his act and, for the purpose of carrying out the agreement, purchased the outstanding one-third interest of the capital stock of the company for the sum of $3,500; and, further, Gross in his testimony says, that when Rivers handed him and Wiener duplicate copies of the contract drawn at Summerville, he said to Wiener:

"This is a preliminary contract for an agreement and you must surrender your copy up to Gross when the final contract is made."

Whatever there may be in these contentions, it seems to us, that they are unimportant here. In concluding the transaction Gross must have relied, for the most part, upon the representations concerning the farm made to him by Wiener. Doubtless he had no other knowledge of the number of fruit trees that were on the farm, their ages or their bearing qualities, and this was the all-important factor in the transaction. These representations were made to him prior to March 10th, and relied on by him in entering into the agreement of March 10th, and it is a matter of no particular importance how this agreement is classified in connection with the agreement of April 19th, as his knowledge on this subject had not changed, and his belief in the truthfulness of the representations was perhaps only strengthened by an incident which had occurred in the meantime.

As previously promised, sometime between March 10th and April 19th, a book of views, carefully and incorrectly prepared with the obvious purpose of deceiving prospective buyers of the farm, and as if the better to confirm the belief which Gross had in the truthfulness of the representations made to him by Wiener, and lest he should become aware of the perfidy of his friend before the consummation of the transaction and the payment of the balance of the purchase price, was placed in his hands by Wiener's order. This book is distinguished particularly by the gross misrepresentations embodied in the foot notes appended to the various views contained therein. According to these notes there were between 80,000 and 90,000 trees on the

place. While the placing of this book in Gross' hands was doubtless intended to mislead and deceive him, we do not believe that it was the controlling factor in causing Gross to fall a victim to the fraud that was perpetrated upon him.

Without going into the evidence in detail relative to the efforts made by Gross to ascertain whether or not he had been deceived, it is enough to say that shortly after the consummation of the transaction on April 19th, 1909, he became suspicious of the truthfulness of the alluring representations made to him by Wiener. Most likely his confidence in his friend had not as yet been shaken and it is equally likely that he was reluctant to think, much less accuse Wiener of having defrauded him. However, under one pretense and another he sent various persons to the farm for the purpose of ascertaining the true state of affairs. But he seems to have been able to get very little information from them. Likewise, by letter he sought to ascertain the true state of things relating to the farm, but without much success.

Sometime before the 1st of January, 1910, having become convinced that probably he had been imposed upon by his unsuspected friend, he consulted counsel as to the course which he should pursue in the premises. This conference resulted in Mr. Neff going to the farm and making a careful examination and investigation of the property, and reporting the true condition thereof to Mr. Gross. Mr. Neff remained on the farm about a week and returned to Cleveland on the 8th or 9th of January. Then for the first time Mr. Gross was fully and accurately apprised of the true condition of the property; and then, also, Mr. Gross became aware for the first time of the absolute falsity of the representations made to him concerning the farm by Wiener. Until he received Mr. Neff's report he was without accurate knowledge as to the number of trees there were on the property, or their ages, or their bearing qualities, and had only such knowledge on that subject as had been imparted to him by the false representations of his friend Wiener and as contained in the untruthful book of views placed in his hands as above stated. He now learned for the first time that instead of their being 50,000 trees on the property, as represented by Wiener, or between 80,000 and 90,000 trees, as indicated by the book of views, there was but a fraction of that number. The investigation of

Mr. Neff disclosed that there were not more than 7,100 trees under five years of age, and not more than 8,100 under seven years of age, and that the great majority of the trees that were on the place were old and valueless; also that the representations concerning the cannery, as well as the representation that the farm had paid a dividend of 30 per cent. in 1908, were likewise untrue.

Without going more into detail as to the evidence relied on by the plaintiff in support of his contentions, we are led inevitably, from a careful reading of the record, to the conclusion that the grossest fraud was practiced upon him and that Wiener imposed upon his confidence and shamelessly outraged his friendship. Indeed, no attempt, or at least very little attempt, is made by the defendants to refute the claim of the plaintiff respecting the representations that were made and their falsity. That they were made, that they were material and that they were relied upon by Gross to his injury, are seemingly irrefutable propositions. The defendants chose rather to defend against the relief prayed for by the plaintiff on the ground that the plaintiff, with full knowledge of the wrong that had been perpetrated upon him, ratified the transaction and acquiesced in his injury. As to this defense, how do the defendants stand before a court of equity?

Ratification has been defined to be the approval by act, word or conduct of that which was improperly done, or of a wrong which was committed. In short, confirmation of a voidable act. In the language of Pomeroy in his work on Equity Jurisprudence, Volume 2, Section 917:

"Acquiescence in the wrongful conduct of another by which one's rights are invaded, may often operate, upon the principles of, and in analogy to estoppel, to preclude the injured party from obtaining many distinctively equitable remedies to which he would otherwise be entitled. In order that this effect may be produced, the acquiescence must be with knowledge of the wrongful acts themselves and of their injurious consequences; it must be voluntary, not the result of accident; nor of causes rendering it a physical, legal or moral necessity, and it must last for a reasonable length of time, so that it will be inequitable even to the wrongdoer to enforce the peculiar remedies of equity against him after he has been suffered to go on unmolested and his conduct apparently acquiesced in."

While they are distinguishable, the doctrine of laches, ratification and estoppel are closely allied.  In *Badger* v. *Badger*, 2 Wallace, 87, it is said:

"There is a defense, peculiar to courts of equity, founded on lapse of time and the staleness of the claim where no statute of limitations governs the case.  In such cases courts of equity act upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, and refuse to interfere where there has been gross laches in the assertion of adverse rights."

And in *Parker* v. *Bethel Hotel Co.*, 31 L. R. A., 706, it is said:

"The defense of laches does not generally apply where the situation of the parties has not been altered and one has not been put in a worse condition by the delay of the other."

Ratification, on the other hand, means confirmation.  The very substance of ratification is confirmation after conduct, and "this is enough," says Bigelow, "to indicate that there may be danger in using the term estoppel freely, for it is common enough at present to speak of acquiescence and ratification as an estoppel.  Neither the one nor the other, however, can be more than part of an estoppel at best.  An estoppel is a legal consequence, a right, arising from acts or conduct, while acquiescence and ratification are but facts presupposing a situation incomplete in its legal aspect, *i. e.,* not as yet attended with full legal consequences.  The most that acquiescence or *ratification* can do, and this either may under certain circumstances do, is to supply an element necessary to the estoppel and otherwise wanting, as, *e. g.,* knowledge of the facts at the time of making a misrepresentation.  But each stands upon its own grounds and must be made out in its own way, not necessarily in the way required by the ordinary estoppel by conduct."  *Bigelow on Estoppel,* 5th Ed., pp. 456-457.

Applying these principles to the case before us, we are clearly of the opinion that the record fails absolutely to disclose such facts and circumstances and such knowledge thereof on the part of Gross, as would estop him from attacking and attempting to have set at naught the contract which through fraud and misrepresentation he was induced to make.  Accordingly a decree will be entered for the plaintiff as prayed for.