GATZ v. BAIN.

CANCELLATION OF INSTRUMENTS—DEEDS—MENTAL INCOMPETENCY—
APPEAL AND ERROR.
> In a suit to set aside a deed on the ground of the mental incompetency of the grantor, the decree of the court below in favor of plaintiffs is affirmed by an equally divided court.

Appeal from Oakland; Gillespie (Glenn C.), J. Submitted October 18, 1927. (Docket No. 95, Calendar No. 33,290.) Reargued October 24, 1928. Decided December 4, 1928.

Bill by Henry Gatz and another against Hattie Bain to set aside a deed. From a decree for plaintiffs, defendant appeals. Affirmed by an equally divided court.

*Pelton & McGee,* for plaintiffs.
*Robert D. Heitsch,* for defendant.

McDONALD, J. All of the parties to this suit are children of Fred Gatz, deceased. In June, 1902, a short time before his death, he deeded a farm to the defendant. This bill was filed to set aside that deed on the ground of mental incompetency. On the hearing, the circuit court set it aside. The defendant has appealed.

There is involved the question of mental competency, the application of the statute of limitations, estoppel, and laches. On the question of mental competency, we think the evidence clearly establishes the following facts: The grantor, Fred Gatz, died when he was 50 years of age. During the last four or five years of his life, his conduct became

so habitually irrational as to justify the belief that
he was suffering from some serious mental disturb-
ance.  On numerous occasions he attempted suicide
by hanging or drowning.  He had frequent periods
of crying and melancholy.  He would disappear from
home, go out into the woods, and, while his wife and
boys were hunting for him, would climb up into a
tree or dodge from tree to tree so that he could not
be seen.  He walked around in the snow in his bare
feet, and explained that he did so "to freeze him-
self to death."  At times, he would not sleep in the
house but would go to the barn during the cold
weather and lie down without sufficient clothing un-
til coaxed back to the house.  He hitched a horse
to a large boulder, which it was unable to move, and
cruelly beat it until compelled to desist by a mem-
ber of the family.  On another occasion he pounded
the horses severely on their heads because, as he
said, they were making faces at him.  Sometimes he
would not eat for two or three days.  On other oc-
casions, when offered food at the table, he would
help himself and throw the balance of it out of doors.
He put a pair of his new shoes and some of his
clothes in the stove to burn them.  He burned family
pictures and the Bible.  He set fire to the house, and,
on another occasion, when a load of grain tipped
over, he got matches and attempted to burn it.  This
conduct continued up to the time when he became
confined to his bed for a few months during his last
illness.

The only reasonable inference from these acts is
that Mr. Gatz was suffering from some serious men-
tal disorder.  There is no other way of accounting
for them.  His frequent attempts at self-destruc-
tion show unsoundness of mind.  The desire to live
is strong in every normal person.  True, there are

persons mentally competent to transact business who commit suicide, but there is usually a cause for it. A great grief, disappointment, domestic trouble, or incurable disease will unbalance some minds to' such an extent as to deprive them of the desire to live. But this man had no such trouble. His desire to destroy himself was the product of a diseased mind. And so, too, were the many other irrational acts which he so frequently indulged in. But notwithstanding all of this abnormal conduct, it must be held that he was mentally competent to make a deed of his property if he had sufficient mental capacity to transact ordinary business, or if it appear that he was rational at the time he executed the instrument.

The best evidence that he was not competent to transact ordinary business is that he did not do so. He did some things in connection with the farm, but the proofs conclusively show that Mrs. Gatz was in general charge. Mr. Hess, who lived in the same locality for many years and who had adequate opportunity to observe conditions in the Gatz family, testified:

"I didn't consider he was in charge of what little business there was to be done about the farm; I considered Mrs. Gatz had charge of it. I don't think she was rather a dominating personality. I was at the home on several occasions other than the time that I was there to thrash; I cut grain for Mr. Gatz with the grain binder. I think Mrs. Gatz paid me for that; I think Mrs. Gatz spoke to me about coming there to cut the grain."

There is other evidence that Mrs. Gatz handled all the money, paid the taxes and interest, and was in active management of all outdoor work about the farm. Mr. Gatz was not competent to transact such business. He had not sufficient mental capacity to

care for and to preserve his property. He did not comprehend its value to himself and to his family. This is evidenced by the fact that he deliberately attempted to burn his buildings and to destroy other property that they had all worked hard to accumulate. There was no improvement in his mental condition. It gradually grew worse. Mrs. Mitchell, who is not financially interested in the outcome of this suit, and whose testimony was supported by that of neighbors, testified:

"The physical condition of my step-father was very bad during the last four or five years of his life. Physically, he gradually went worse. His mental condition was very bad during the last four or five years. He gradually grew worse mentally during that period."

No witnesses testified to his mental condition at the very time he signed the deed, but a neighbor, who visited him "shortly before" and after it was executed, and whose long acquaintance and opportunities for observation entitled his opinion to much weight, testified:

"I don't think he knew enough to know what he wanted to do with his property."

Mr. Patterson, who prepared the deed, and the defendant are the only living persons who were present when it was executed. The defendant was a witness on the hearing. She was allowed to testify to matters equally within the knowledge of the deceased, but did not say that he was rational when the deed was executed, nor did she testify to any circumstances that would indicate he was rational or comprehended what was going on. Mr. Patterson says that he saw nothing unusual in Mr. Gatz' condition, that he read the deed to him and explained

what it was but does not remember that Mr. Gatz made any response.

"*Q*. And did he tell you what he wanted done with the property?

"*A*. Nothing more than after the deed was read over to him he signed it."

The deed itself throws some light on the question. Though he could write his name in English, it was signed by his mark. It was a voluntary conveyance of all of his property to the defendant, to the exclusion of the other children who had labored hard in helping him accumulate it. Both of the boys were older than the defendant. Neither was married. The boys had no property. Henry, the eldest, had suffered an injury which resulted in the amputation of one of his limbs. He was handicapped in making a living. The record shows no prejudice or hostility on the part of Mr. Gatz toward either of his sons. There is nothing tending to show why he should exclude them from a share in his estate. He had a right to do so, but their claim upon his bounty would naturally appeal to a rational mind and may properly be considered along with other evidence in determining his mental competency. We think it fairly appears from the evidence that during the last few years of his life Mr. Gatz was suffering from some mental disease that influenced his conduct and impaired his capacity to transact his ordinary business; that his mental disease was of a progressive character and had reached such a stage at the time the deed in question was made as to render him wholly incompetent to transact business of that character.

Plaintiffs' remedy not barred by statute of limitations. Mrs. Gatz, the widow, was living when this

bill was filed. They were in possession with her. They had no action at law.

"While courts of equity are not within the words of the statute of limitations, it is generally held that they should by analogy apply the statute in any case where the remedy in equity is concurrent only or a substitute for an action at law." *People, ex rel. Attorney General,* v. *Railroad Co.,* 145 Mich. 140, 145.

"In suits for specific performance, while courts of equity have regard to statutes of limitation, and by analogy are inclined, as a general rule, to conform therewith when considering and applying the doctrine of laches, they are by no means absolutely conclusive and are often disregarded. Laches may be declared to be a bar long before the statute has run, or, where equitable reasons for delay have been shown, relief may be granted at a time beyond the statutory period." *Rodgers* v. *Beckel,* 172 Mich. 544, 550.

The plaintiffs' remedy is not barred by laches. Laches is an equitable defense. Lapse of time alone does not create it. There must be other circumstances that make it inequitable to grant the relief prayed for. Such a circumstance would be a change in conditions to the detriment or disadvantage of the party against whom the relief is sought. *Walker* v. *Schultz,* 175 Mich. 280.

"But delay alone, unaccompanied by other circumstances, will not necessarily preclude relief. In every case where the defense is founded on mere delay, that delay, of course, not amounting to a bar of any statute of limitations, the validity of that defense must be tested upon principles substantially equitable. Two circumstances, always important in such cases, are the length of the delay and the nature of the acts done during the interval, which might affect either party or cause a balance of justice or

injustice in taking one course or the other, so far as relates to the remedy. The doctrine of laches, as understood in courts of equity, implies injury to the party pleading it as a defense. Where the situation of the parties has not been altered, and one has not been put in a worse condition by the delay of the other, the defense of laches does not generally apply." *Parker v. Bethel Hotel Co.*, 31 L. R. A. 706, 714 (96 Tenn. 252, 34 S. W. 209).

In the instant case there was a delay of 23 years in bringing suit. The grantor died in August, 1902. After his death there was no adjustment of the property interests. The widow, the two plaintiffs, and the defendant continued to make their home on the farm and lived together in friendly relations until the defendant married in 1913. After that time the plaintiffs and their mother continued in possession of the farm. In 1925 the defendant began proceedings to have her mother adjudged incompetent. Counsel retained by the plaintiffs discovered the recorded deed. Shortly thereafter this suit was commenced. The circuit judge found that the plaintiffs had no actual knowledge of the deed until informed by their counsel in the year 1925. The evidence supports this finding. These facts and circumstances satisfactorily account for the long delay in bringing suit. They show that the plaintiffs have not been guilty of culpable delay. In any event, the defendant was not injured by the delay. Her situation was in no way changed. Nothing occurred during the interval that would render it inequitable to enforce the plaintiffs' right to have the deed set aside. The language of Mr. Justice STEERE in *Parks v. Brooks,* 188 Mich. 645, 661, is applicable here:

"Laches rests chiefly on the inequity of permitting a claim to be enforced by reason of changed

conditions or relations of the property or parties resulting from delay. Here the delay has worked no wrong or changes, prejudicial to him.''

The decree of the circuit court is in accord with substantial justice. It is affirmed, with costs to the plaintiffs.

CLARK, POTTER, and SHARPE, JJ., concurred with McDONALD, J.

WIEST, J. *(for reversal).* I cannot concur in the opinion prepared by Mr. Justice McDONALD.

Plaintiffs' claim is stale. It is true that ejectment could not have been brought during the lifetime of their mother, who had a life lease of the property, but a bill to set aside the deed could have been filed. While the doctrine of laches is not controlled by the statute of limitations, yet equity will adopt the statute rather than the doctrine unless there is some good reason for doing otherwise. No such reason exists in this case.

It is evident that the grantor was subject to spells of melancholy during which he cried, threatened to kill himself, was taciturn, very unsocial, and committed crazy acts. But the evidence is equally clear that such spells were periodic only, and, when not so suffering, he was mentally capable of transacting business and executing a deed.

In 1902, when the deed was given to the daughter, the 80-acre farm was worth about $2,000, because it was poor soil, being sand and marsh, had no buildings of much account, and returns from it were very meager. By reason of demand for summer resort purposes, the farm is now conceded to be worth $100,000. Subject to the life estate of the mother the farm was not, at the date of the deed, much of a gift, for, if then divided among the three children, it would have netted but a pittance for each, subject

to the dower right of the mother. It was not then worth family dissension or fighting over, but now affords an incentive for this suit.

When the deed was executed defendant was 16 years of age, and plaintiffs were of full age. The record is not clear, but, as I understand it, the defendant, with the knowledge of plaintiffs, went to Pontiac and brought Mr. Nusbaumer to the home before the deed was made, and later Mr. Nusbaumer had Mr. Samuel J. Patterson, an attorney at Pontiac, prepare the deed, and the two then drove to the farm and there the deed was executed. The mother, the two plaintiffs, defendant, and her half-sister, Mrs. Mitchell, were all at the farm that day and knew the two men were there on a business errand, and I am satisfied that, in a home where so little occurred, such an event was not passed over without knowledge of its purpose. I am of the opinion that the whole family knew what was then done.

Plaintiff George Gatz was 48 years of age at the time of the hearing, and he testified:

"*Q.* You know your mother had the life use of this farm after your father's death?

"*A.* I didn't know how it was going, hardly. I talked with my mother about something about the farm after my father died. The first talk I had with her was about 10 years after father's death; that was about 14 years ago, and no one was present but she and I. I couldn't tell you now what we did say; I don't remember in a general way what we talked about. I don't know whether I wanted her to do something about the farm or not; I did talk with her about doing something about the farm, but I don't know what I told her. * * *

"*Q.* Now, do you recall an occasion at the breakfast table when Will Craig and Frank Craig were there repainting the house, of the fact that Hattie had a deed to it, being talked about?

"*A.*   If they did talk about it, I forgot about it.

"*Q.*   George, you won't say that wasn't talked about in your presence when the Craig boys were over there?   You wouldn't swear there wasn't any such talk?

"*A.*   I wouldn't swear there wasn't, no."

Plaintiff Henry Gatz testified:

"*Q.*   Henry, were you at home on occasions when Joe Nusbaumer came out when your father was sick the last time?

"*A.*   Yes, but I wasn't inside, see?   *   *   *

"*Q.*   And your mother asked you to hitch up the horse so your mother could drive down and get Joe?

"*A.*   I don't know—

"*Q.*   Well, you did hitch up the horse?

"*A.*   Yes, I guess I did, anyway.

"*Q.*   You don't remember?

"*A.*   No, I·don't remember.

"*Q.*   Your mother told you your father wanted to see Joe Nusbaumer, didn't she?

"*A.*   Yes.

"*Q.*   What did she tell you?

"*A.*   Well, I don't know exactly.

"*Q.*   You don't remember now?

"*A.*   No.   She said she wanted to see Joe Nusbaumer but I don't remember why it was or anything of the kind.

"*Q.*   Well, you understood at the time it was for the purpose of making some disposition about the farm?

"*A.*   Yes.   *   *   *   After my father died I made arrangements with my mother that I would work the farm on shares for her.

"*Q.*   And did work the farm on shares for her during practically all the rest of her life?

"*A.*   Well, yes, but it took all of it to pay taxes and to live on mostly.

"*Q.*   And you knew that your mother had a life use of this farm?

"*A.*  Yes.

"*Q.*  She told you that, didn't she?

"*A.*  Yes.

"*Q.*  And she told you that your father had given Hattie the deed after she got the life use of it?

"*A.*  She didn't say anything about that.

"*Q.*  But she did tell you that she had a life use of it?

"*A.*  Yes.

"*Q.*  And she told you that it was on this business that Joe Nusbaumer came out that day, didn't she?

"*A.*  Yes.

"*Q.*  When did she first tell you that?

"*A.*  Well, she told me that after—a week or so after he come there."

The mother must have known of the giving of this deed for she claimed a life lease under its terms, and both plaintiffs were fully aware of the life lease.

Mr. Nusbaumer is dead. The deed was recorded in August, 1902, 23 years before this suit was heard in the circuit.

Plaintiff Henry Gatz met with an injury resulting in the amputation of one of his legs. But for the 23 years that his mother claimed possession of the premises under the life lease in the deed he worked the land on shares, dealing with his mother as having a life estate. The deed must have been satisfactory to the mother, for it was executed by her husband without her joining as a grantor and she accepted the provision therein giving her a life lease of the premises.

There is nothing in the case establishing any claim of the sons upon the bounty of their father.

The decree should be reversed and the bill dismissed, with costs to defendant.

Fead, C. J., and North and Fellows, JJ., concurred with Wiest, J.